Ala. & Tenn. Rivers Railroad Co. v. Kidd.

---

## ALA. & TENN. RIVERS RAILROAD CO. *vs.* KIDD.

[ACTION AGIANST RAILROAD COMPANY FOR FAILURE TO DELIVER FREIGHT.]

1. *Liability of railroad company as common carrier and warehouse-man.*—If goods are transported by railroad, consigned to the owner or a third person, and are not called for by the consignee when they arrive at their destination, or within a reasonable time thereafter, and are then deposited by the railroad company in one of its own warehouses, to be kept for the owner or consignee, the company ceases to be liable as a common _carrier, and becomes liable only as a warehouse-man, or bailee on deposit; and if the company has no warehouse at that place, it may deposit the goods in the warehouse of a responsible third person, for and on account of the owner or consignee, and thus put an end to its liability as a carrier; but, if the company binds itself to deliver the goods to *its own agent*, it becomes liable as a carrier for their transportation, and as a warehouse-man for their subsequent safe-keeping and delivery; and if its agent deposits the goods in the warehouse of a third person, who, by mistake, delivers them to a person not authorized to receive them, it is responsible to the owner for them.

2. *When trover lies against warehouse-man.*—Trover lies against a warehouse-man, if he has delivered the goods, though by mistake, to a third person; but not if the goods were lost or stolen by his negligence; nor for a mere non-delivery of the goods, unless they are in his possession, and he refuses to deliver them on demand.

3. *Proof and requisites of custom.*—The fact that a railroad company has been, for about a month, in the habit of depositing in a particular warehouse freight that was not consigned to any named person, without any proof that this was generally known, or that a party dealing with the company had notice of it, is not sufficient to establish the custom as an element of a particular contract.

APPEAL from the Circuit Court of Dallas.

Tried before the Hon. E. W. PETTUS.

THIS action was brought by John W. Kidd, against the appellant, to recover damages for the defendant's failure to deliver eight bales of cotton, which the plaintiff shipped at Montevallo, to be forwarded to Selma. The complaint contained several counts in case for negligence, and one count in trover. No pleas appear in the record. The case may be found reported, on a former appeal, in 29 Ala. 221.

"On the trial, the plaintiff read in evidence the testimony of R. B. Sawyer and J. R. Bates, who proved that, as agents of the defendant, they received eight bales of cotton from the plaintiff at Montevallo, for which a receipt was given, dated Dec. 3, 1853, and signed 'R. B. Sawyer, agent, *per* J. R. Bates,' in these words : 'Received of J. W. Kidd eight bales of cotton, in good order, marked J. W. K., to be delivered, in like good order, to R. R. agent in Selma.' The plaintiff then read the testimony of W. G. Bowden, as follows ; 'In the winter of 1853–4, I purchased from John W. Kidd some cotton—number of bales not recollected. A part of this cotton (four bales) was, at the time of the purchase, in Selma, on store with Adams & Blackburn. I cannot say whether these four bales were the cotton of John W., or of Joseph W. Kidd, having purchased from the former his own cotton and cotton belonging to Joseph W., his brother. I gave the receipt, calling for said four bales of cotton, to Gen. W. Kidd, then on his way by Selma to Louisiana, with the request that he would call on Adams & Blackburn, and have the cotton shipped to Harrison & Robinson, Mobile. Some time after this, I called on Adams & Blackburn, to know whether Gen. Kidd had shipped the cotton as

requested. Adams told me, that he had not. I told Adams, that I had bought four bales of cotton from John Kidd, on store with him, but had not the receipt, as Gen.' Kidd had omitted to attend to the shipping, and' had carried the receipt with him to Louisiana. Adams replied, that I could have the cotton without the receipt; and accordingly turned me out four bales, which I then had no doubt was my cotton; but I now have reason to believe that Adams had mistaken the plaintiff's cotton for mine. That reason is, that the four bales weighed in Mobile about 30 lbs. each more than the amount claimed by John W. Kidd for the bales bought of him. I knew nothing of the mistake in the shipment, (if a mistake at all,) until some months afterwards, when the plaintiff came to me, and stated that I had shipped his cotton, and that Adams had so informed him, and demanded that I should pay him for his cotton. I made the explanation above given, and told him that he had better get the four bales which must have been left in the place of his, and that Adams would let him have my cotton, which must be in the warehouse. Kidd objected, saying that his bales were heavier than mine, and refused to so adjust the matter. I cannot say how my cotton was marked, as I purchased the cotton of John W. and Joseph W. Kidd, and do not know from whom these four bales were purchased. Their average weight was 530 lbs. At the time I received the cotton from Adams & Blackburn, I did not know that the plaintiff had any cotton on store with them.' The plaintiff then proved the market value of the cotton, and closed.

"The defendant then proved, by one R. F. Kent, that he was the clerk of James Adams & Co., and, as such clerk, received from Sullivan, the superintendent of the railroad, the plaintiff's eight bales of cotton sued for; that it was customary for the railroad agents to turn over to James Adams & Co. all cotton not otherwise consigned; that the railroad company had no warehouse at Selma; that the warehouse of James Adams & Co. belonged to the railroad, but was rented by them to Weaver & Blackburn, who rented it again to Adams & Co.; that Weaver

& Blackburn were in possession only three or four days, and James Adams & Co. had been in possession a little more than a month when this cotton was received; that the defendants extended their railroad to Montevallo, and commenced shipping cotton from that point, in the fall of 1853; that the warehouse occupied by Adams & Co. had only been occupied about twenty-eight days at the date of said receipt; that it was first occupied by Weaver & Blackburn, for four or five days, and then by said Adams & Co., who took possession in the early part of November, 1853. The defendant then read in evidence the testimony of James Adams, as follows: 'In 1853, about the 1st November, I, in connection with D. S. Arnold, under the firm name of James Adams & Co., rented the warehouse in Selma known as the railroad warehouse, the same now in possession of Keith & Lundie. I kept said warehouse, in connection with Arnold, until September, 1854. The railroad (Alabama and Tennessee) delivered to us all the cotton shipped over the road, and not otherwise consigned; and nearly all the cotton shipped over the road was stored at our warehouse, which was the nearest to the depot. The cotton marked J. W. K., consisting of eight bales, was delivered by the agent or superintendent of the railroad to James Adams & Co. as soon as it was brought in on the road, and we paid him the freight for all the cotton. The cotton remained in store, until W. G. Bowden claimed four bales of the cotton marked J. W. K., and shipped it to Mobile; and the other four bales were delivered to the plaintiff. The cotton would average about 520 lbs. per bale. Bowden shipped the bales marked J. W. K. on the 5th February, 1854. Arnold and myself rented the warehouse, in November, 1853, from Weaver & Blackburn. We were to pay them five cents per bag for all the cotton which came down the road and was stored with us. The warehouse was unfinished when we took possession of it. There were no platforms, and no cotton had then been stored in it. November, 1853, was the commencement of storing cotton there. Sullivan turned over to Adams & Co. the eight bales of cotton marked J. W. K., and we received

it from the Alabama and Tennessee Rivers Railroad Company, as from any other consignee.'

"This being all the evidence, the court charged the jury—

"1. That if the defendant, by its authorized agent, gave the receipt which had been read in evidence, and received the eight bales of cotton under said receipt, then it became the defendant's duty to carry the cotton to Selma, and to deliver it to their agents, to be kept for the plaintiff; and if the defendant carried the cotton to Selma, and delivered it to Adams & Co., to be kept by them as defendant's agents, and Adams & Co. were guilty of a conversion of four bales, then the defendant is liable for the said conversion; but, if the defendant carried the cotton to Selma, and delivered it to Adams & Co., who were not the defendant's agents, and thereby placed the cotton beyond its control, then the delivery of the cotton to Adams & Co. was a conversion.

"2. That if there was a custom, or usage of trade, in Selma, to the effect that the railroad company might store in the warehouse of Adams & Co. all cotton shipped over the railroad to Selma, and not separately consigned to any warehouse or person; yet, if that custom or usage had existed for only one month, it was not sufficient to authorize the defendant to store the plaintiff's cotton in said warehouse, at his risk.

"The defendant excepted to each of these charges, and then requested the court to instruct the jury—

"1. That if they believed from the evidence that the plaintiff selected the agent of the railroad company at Selma as his agent, to receive the cotton shipped by him at Selma; and that the railroad had an agent at Selma when the cotton was so shipped; and that the cotton was delivered to said agent within a reasonable time after the shipment,—then the plaintiff cannot recover.

"2. That the contract in evidence does not, on its face, impose on the railroad company any other duty than to deliver the cotton named in it to the railroad agent at Selma; and if it was delivered to said agent, that was a compliance with their contract.

"3. That if the jury believed from the evidence that the plaintiff's cotton was shipped over the defendant's railroad to Selma, within a reasonable time after the receipt of it, in good order, and was there delivered to the railroad agent, who, in good faith, as soon as it was received in Selma, delivered it to James Adams & Co.; and that said Adams & Co. were regular warehouse-men in Selma, and their warehouse was the nearest to the railroad depot; and that the railroad company had no warehouse in Selma, or other place, for the storage of cotton; and that said company had been in the habit of storing in the warehouse of said Adams & Co. all cotton shipped over their road, which was not consigned to some particular person; and that this had been the custom of the road from the time the company commenced, to carry cotton from Montevallo to Selma; and that Adams & Co. received the cotton on account of the owner, and paid the freight to the railroad company, and afterwards delivered four bales of the cotton to Bowden, who sold it,—this act of delivery to Bowden is not a conversion of the cotton, for which the railroad company would be liable.

"4. That if the evidence shows there was a custom, or usage of trade, in Selma, in reference to the delivery of cotton by the railroad company to Adams & Co., where no directions were given by the owner as to the warehouse in which the cotton was to be stored, that it would be stored with Adams & Co., and that this usage of trade was generally known,—then the plaintiff is affected by such usage of trade.

" 5. That if the plaintiff shipped his cotton to Selma on the defendant's railroad, and directed it to be delivered in the manner set forth in the receipt read in evidence; and if it was so delivered to such agent, and the plaintiff was not present in Selma to receive it, and made no provision for the care or custody of the cotton; and the railroad agent, in the absence of the plaintiff, and of instructions from him how to dispose of the cotton, in good faith stored it with Adams & Co.,—this was not an illegal user or misuser of the cotton; and if Adams & Co. afterwards

allowed the wrong person to take the cotton, this is no conversion of the cotton by the defendant, and the plaintiff cannot recover in this action.'

"The court refused each of these charges as asked, but gave the fourth ;with this qualification:   That if said custom only existed one month prior to the time when the cotton was shipped to the defendant, it would not bind the plaintiff, unless the evidence showed that he knew it;' and the defendant excepted, both to the refusal of the several charges asked, and to the qualification given."

The charges given by the court, and the refusal of the charges asked, are now assigned as error.

MORGAN & BYRD, for appellant.—1. The evidence fully met the 4th and 5th counts in the complaint, the gist of which was the failure to deliver the cotton to the railroad agent at Selma; and the plaintiff was compelled to rely for a recovery on the 3d count, which was in trover.   To support this count, it was necessary to read the receipt given for the cotton, which was construed by the court as imposing on the company the duty of keeping the cotton in Selma after its delivery to their agent at that place.   Aside from the influence of any custom, the receipt only stipulated for the delivery of the cotton, in good order, to the railroad agent at Selma; and the performance of this act was a full compliance with the obligation of the company as common carriers.   If the receipt imposed upon the company any additional obligation, it was in the character of warehouse-men, or depositaries without reward; and a very different degree of responsibility attached to this new relation.—Angell on Carriers, § 302; Thomas v. Boston & Providence Railroad Co., 10 Metcalf, 2.

2. The receipt does not establish that the railroad company assumed to act in any other capacity than that of common carriers.   The terms "R. R. agent at Selma," of themselves, do not import that the agent there was anything more than an agent to superintend the general business of the company.   But, if those words, construed

in connection with the others, "to be delivered," import an agency to receive the cotton; still, it does not follow that it was the duty of the agent to do more than any other agent of a common carrier on the receipt of the goods at the place of destination. If it was his duty, as railroad agent, to deliver the cotton to the owner; and if a delivery to him was not, by the terms of the contract, a delivery to the owner; still, the railroad company would not become liable because of his failure to keep the cotton, but only for a delivery by him to an improper person, or a failure to deliver within a proper time. The circuit court held the company liable to account, on the face of the paper, not only as common carriers, but also as warehouse-men. The company was not pursuing the business of warehouse-men, and had no warehouse for the storage of goods. No agreement was made for the storage of the cotton, and no further compensation was paid therefor.—10 Metcalf, 2.

3. If the receipt means that the railroad agent at Selma should receive the cotton from the railroad, and, as such agent, then deliver it to the owner, the court erred in holding that, under the circumstances mentioned in the fifth charge asked, the defendant was guilty of a conversion, if said agent delivered the cotton in good faith to Adams & Co. If the owner fails to consign his goods to some agent or factor, and is not present to receive them when delivered, and makes no provision for their care or custody, the carrier is discharged on his delivery of them to a public warehouse; and if such warehouse-man fails to keep them, or delivers them to the wrong person, the carrier is not guilty of a conversion.—Young v. Smith, 3 Dana, 93; Chicago Railroad Co. v. Warren, 16 Illinois, 502. When the non-delivery of goods by a carrier arises from inability to deliver them, he is not liable in trover. 2 Burr. 2525; 2 Ld. Raymond, 792; 4 Esp. 157; 2 Saunders on Pl. 880–82. If the defendant be charged for a conversion by the act of his servant, the plaintiff must show the authority of the servant to make such conversion.—1 Car. & P. 75, 366; 7 Porter, 279; 2 Saunders on Pl. 885.

ALEX. WHITE, with S. R. BLAKE, *contra.*—1. The custody and control of the cotton passed from the plaintiff when he delivered it to the railroad, to be delivered to its own agent at Selma; and a delivery to such agent did not change the custody and control. If the cotton was lost while under the control and custody of the railroad, whether by conversion or otherwise, the company is responsible.—29 Ala. 226.

2. No custom was proved, such as could be considered a part of the contract between the parties.—9 Ala. 565.

R. W. WALKER, J.—If goods, transported by railroad, are not called for by the consignee when they arrive at their destination, and are then deposited in the warehouse of the company without additional charge, until the owner or consignee has a reasonable time by the exercise of proper diligence to remove them, the liability of the company, *as a carrier,* is at an end; and if, after this, the goods remain in their warehouse, they are responsible only as keepers for hire. The same company may thus, under one and the same contract, be subject to the distinct duties of carriers and warehouse-men, for a failure in which they are liable to different degrees of responsibility. While holding the former relation, they are insurers against all losses, except those occasioned by the act of God or the public enemies. In the latter relation, they are responsible only for losses occasioned by their want of such care as is required of ordinary bailees for hire.—Norway Plains Co. v. B. & M. R. R., 1 Gray, 263; Thomas v. Boston & P. Co., 10 Metc. 472; McHenry v. Phil., W. & B. R. R., 4 Harring. 448; Redfield R. R. 253-4; Pierce R. R. 435, 448; Moses v. Boston & M. R. R., 32 N. H. 523; 1 Parsons Con. 671.

The precise point of time at which the company cease to be carriers and begin to be warehouse-men, is a question upon which the authorities are not uniform, and into the discussion of which it is unnecessary for us to enter. See 1 Gray, 263, 274; 32 N. H. 523; Redfield, 253-4-5; Pierce on R. R. 438, 443.

But, however common or convenient may be the prac-

tice of having warehouses for storage, as accessories to the business of the road, it cannot be said that the company are under an absolute *duty* to erect or keep them. Redfield, 254. And if they in fact keep no such warehouse at the point to which goods consigned to the owner or a third person are sent, it seems that the duty of the company is performed, and their responsibility at an end, if, after carrying the goods to the place of destination, and keeping them safely for such a length of time as to afford the owner an opportunity, by the use of due diligence, to remove them, they deposit them in the warehouse of a responsible person, for and on account of the owner or consignee. In such a case, the warehouse-man with whom the goods are stored, becomes the agent or bailee of the owner. It must be remembered that, in contracts for the carriage of goods, the obligation is not all on one side. It is as much a part of the contract, that the owner or consignee shall be ready at the place of destination to receive the goods when they arrrive, or within a reasonable time thereafter, as that the carrier shall transport and deliver them. If, however, the consignee is dead, or absent, or fails to receive the goods, the carrier is not justified in abandoning them; unless, *perhaps*, (for even this is by no means clear,) where the consignee, after actual notice of the arrival of the goods, *refuses* to receive them.—See Fisk v. Newton, 1 Denio, 45; Smith v. Nashua R. R., 2 Foster, 86; Hemphill v. Cheine, 6 W. & S. 62; Pierce R. R. 448–9; 1 Parsons Con. 660. On the contrary, it is his duty to secure them for the owner. He may, if he so elect, keep them as a bailee on deposit; or, if he has come under no obligation, either by the terms of his agreement, or the course of business, to hold the goods as bailee, he has the right to leave them in store with some responsible third person, and thus discharge himself from all further liability. Clendaniel v. Tuckerman, 17 Barb. 189; Ostrander v. Brown, 15 Johns. 39; Goold v. Chapin, 10 Barb. 612; Fisk v. Newton, 1 Denio, 45; Crawford v. Clark, 15 Ill. 566; Angell on Carr. § 291; 1 Parsons Con. 660; Pierce R. R., 449.

In the present case, the proof shows that, when the contract was made, the company kept no warehouse for storage at Selma; and, according to the rules just stated, if the appellee's cotton had been consigned to the owner, or to some third person, and the consignee had failed to come forward and secure it after a sufficient time had been allowed for that purpose, the company would have been authorized to store it, for and on account of the owner, in the warehouse of some responsible person, who would thereupon have become the bailee of the owner, and to whom alone he could have looked for losses or injuries thereafter occurring.

But the contract of the company was to deliver the cotton to *their own agent*. Under this contract, are their liabilities and duties no greater than they would have been if the obligation had been to deliver to the owner, or to some third person named as consignee? In the absence of any usage or custom giving a different effect to this agreement, we think that we carry out the intention of the parties, by holding that the company imposed upon themselves, not only the duty of carrying the cotton to Selma, but also of holding it safely after its arrival there, until called for by the owner, and of delivering it to him on demand. For the performance of the former duty, they were responsible as carriers; and for the discharge of the latter, they were liable as warehouse-men. By contracting to deliver to their own agent, they impliedly agreed to act as the consignees of the owner; and thus bound themselves to take care of the cotton for him, as his bailee, after its arrival in Selma. If we do not adopt this construction, then the duties of the company were precisely the same as if the cotton had been consigned to the owner himself, and no special purpose was either designed or accomplished by making the agent of the company the consignee. The extent of the obligation assumed by the company being such as we have stated, it follows that when their agent, after the delivery of the cotton to him, deposited it in the warehouse of Adams & Co., the latter became, *quoad* this particular cotton, and as between the owner and the railroad, the

agents and servants of the company; and if, by their mistake, the cotton was delivered to one who was not authorized to receive it, the company would be responsible to the owner.—Lechtenheim v. Boston & P. R. Co., 11 Cushing, 70; Bullard v. Young, 3 Stew. 46.

[2.] Trover will not lie for a bare non-delivery of goods by a warehouse-man, unless they are in his possession, and he refuses to deliver them on demand. In like manner, trover will not lie for goods lost or stolen by the negligence of a warehouse-man. But, where he is an actor, and delivers them to a third person, though by mistake, the action lies.—Devereux v. Barclay, 2 B. & Ald. 702; Youle v. Harbottle, Peake's N. P. C. 49; Packard v. Gettman, 4 Wend. 613; 2 Saund. Pl. & Ev. 1159; Story on Ag. §§ 452–3; Smith on Master and Servant, 51–4.

[3.] When this case was here before, it was held, that it was competent for the company to prove that it was their custom to deposit freight, transported by the road and consigned to their agent, in the warehouse of Adams & Co.; and that if such custom existed, and was proved according to the rule governing in questions of that description, it might relieve the company from the liability which would otherwise rest upon them, for the loss of the cotton in the hands of their agent.—Ala. & Tenn. R. R. v. Kidd, 29 Ala. 221. The evidence, all of which is set out in the bill of exceptions, wholly fails to establish any such custom or usage as can be looked to in the interpretation of contracts. Usage, to be binding, must be of such duration, so clearly established, and so generally known and acquiesced in, that the parties must be presumed to have contracted with reference to it.—Steele v. McTyer, 31 Ala. 676; Crawford v. Clark, 15 Ill. 567; Dixon v. Dunham, 14 Ill. 324; Angell on Carr. § 301. The fact that the company had been, for about a month, in the habit of storing cotton consigned to their agent, in the warehouse of Adams & Co., without any proof that this was generally known, or any other evidence that the appellee had notice of it, cannot be sufficient to establish a custom which must be deemed to have entered into the contract made between the parties to this suit.

Considering the charges given, and those refused, with reference to the evidence before the jury, we find no error in the rulings of the court.

The judgment is affirmed.

A. J. WALKER, C. J., being a stockholder in the Alabama and Tennessee Rivers Railroad Company, does not sit in this case.