# NORTH PENNSYLVANIA RAILROAD COMPANY *v.* COMMERCIAL BANK OF CHICAGO.

ERROR TO THE CIRCUIT COURT OF THE UNITED STATES FOR THE EASTERN DISTRICT OF PENNSYLVANIA.

Argued November 22, 23, 1887. — Decided December 19, 1887.

A Circuit Court of the United States may direct a verdict for the plaintiff when it is clear from all the evidence in the case that he is entitled to recover, and no matter affecting his claim is left in doubt to be determined by the jury.

The undertaking of a common carrier to transport live-stock, though differing in some respects from the responsibility assumed in the carriage of ordinary goods, includes the delivery of the live-stock.

When a railroad company receives live-stock for transportation by means of connecting lines to a named consignee or to his order at a destination beyond its terminus, and gives a receipt or bill of lading in accordance therewith, and delivers the property safely to the next connecting line, from which it finally passes into the possession of the connecting company on whose line the point of destination is, the latter company is bound to deliver the property there to the consignee or to his order, if they are made known to it on receiving the freight; and it is not released from that liability by reason of a practice or custom to deliver all such freight to a drove-yard company without requiring the production of the bill of lading or receipt, or other authority of the shipper, knowledge of the practice or custom not being brought home to the holder of such receipt, bill of lading, or other authority.

A railroad company received live-stock to be transported over its line and over connecting lines to a distant point beyond its terminus. It gave the shipper a receipt stating that they were "consigned to order P. M." (who was also shipper and owner), "notify J. B." at the point of destination. The goods were safely transported to that point. The agents of the last transporting line received with the property a way-bill containing the same statements as to the consignee, and as to the party to be notified. *Held*, that knowledge of the destination and the consignee of the goods being thus brought to the notice of the company which carried the goods to their destination, it became its duty to deliver, or to instruct its agents to deliver, the property only to the consignee or his order; and that a delivery of the property to J. B. after such knowledge would not avail as a defence when sued for its value by a bank at the place of shipment, which had discounted a bill drawn by the shipper, and secured by an endorsement of the receipt as collateral.

THIS was an action brought by the Commercial National Bank of Chicago against the North Pennsylvania Railroad Company to recover the value of 404 head of cattle received by it in November, 1877, to transport to Philadelphia, and not delivered there to the plaintiff, the assignee of the shipper, or to its order. The facts out of which it arose are briefly as follows:

In 1877 one Paris Myrick was engaged at Chicago in the business of buying cattle and forwarding them by railway to Philadelphia. On the 7th of November of that year he bought 202 head of cattle, weighing 240,000 pounds, and on the same day delivered them to the Michigan Central Railroad Company at Chicago, to be transported to Philadelphia. That company is one of several railway carriers forming a

continuous line from Chicago to Philadelphia. On the delivery of the cattle, Myrick took from the company the following receipt:

> "MICHIGAN CENTRAL RAILROAD COMPANY,
>
> "CHICAGO STATION, *Nov. 7th*, 1877.
>
> "Received from Paris Myrick in apparent good order. Consigned to order Paris Myrick.
>
> "Notify J. & W. Blaker, Philadelphia, Pa.

| Articles. | Marked. | Weight or measure. |
|---|---|---|
| "Two hundred & two (202) Cattle. | | 240,000. |

> "Advanced charges $12.00.
>
> "Marked and described as above (contents and value otherwise unknown), for transportation by the Michigan Central Railroad Company to the warehouse at    *    *    *
>
> "Notice. — See rules of transportation on the back hereof.
>
> "Use separate receipts for each consignment.
>
> "WM. GROGAN, *Agent.*"

On the margin of the receipt was the following notice:

"This company will not hold itself responsible for the accuracy of these weights as between buyer and seller; the approximate weight having been ascertained by track scales, which is sufficiently accurate for freighting purposes, but may not be strictly correct as between buyer and seller.

"This receipt can be exchanged for a through bill of lading."

On the same day Myrick drew and delivered to the Commercial National Bank of Chicago a draft, of which the following is a copy:

> "$12,287.57.        CHICAGO, *Nov. 7th*, 1877.
>
> "Pay to the order of George L. Otis, cashier, twelve thousand two hundred and eighty-seven $\frac{57}{100}$ dollars, value received, and charge the same to account of —      PARIS MYRICK.

> "To J. & W. Blaker, Newtown, Bucks Co., Pa."

As security for the payment of the draft, Myrick indorsed the receipt obtained from the railroad company and delivered

it with the draft to the bank, which thereupon gave him the money.

On the 14th of November, Myrick purchased 202 more head of cattle, weighing 260,000 pounds, and on that day delivered them to the Michigan Central Railroad Company at Chicago, to be transported to Philadelphia, and received from the company a receipt similar to the one taken on the first shipment. On the same day he drew another draft and delivered it to the Commercial National Bank, of which the following is a copy:

"$12,448.12.                        CHICAGO, *Nov.* 14, 1877.

"Pay to the order of Geo. L. Otis, cashier, twelve thousand four hundred & forty-eight $\frac{12}{100}$ dollars, value received, and charge same to account of —           PARIS MYRICK.

"To J. & W. Blaker, Newtown, Bucks Co., Pa."

For the payment of this draft, Myrick indorsed the receipt obtained from the railroad company, and delivered it with the draft to the bank, which thereupon gave him the money. The cattle of both shipments were conveyed on the road of the Michigan Central Railroad Company to Detroit, and thence over the roads of other connecting companies to Philadelphia. The last two carriers were the Lehigh Valley Railroad Company and the North Pennsylvania Railroad Company, whose lines extended between Waverly, Tioga County, N. Y., and Philadelphia. The cattle of both shipments were carried over the roads of these companies from Waverly on their joint way-bills. The thirteen covering the first shipment were dated November 10, 1877, and twelve of them were alike except in the number of cattle carried under them. The following is a copy of one of them:

Form 24—L.                                              *Joint Way-Bill.*

Way-bill of merchandise transported by L. V. R. R. and N. P. R. R., from Waverly to Philad'a, Nov. 10th, 1877.

| Kind and number of car. | Consignee or owner's name. | Description of articles. | Weight. 1st class. | Weight. 2d class. | Weight. 3d class. | Weight. 4th class. | Weight. Class A. | Rate. | Prepaid. | Freight. | Expenses. | Consignor. |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Erie, 30483... | P. Myrick. Notify J. & W. Blaker. | 18 cattle, rec. | 20,000 | ...... | ...... | ...... | ...... | 15 75 | ... | 31 50 | 21 86 | Buffalo. |

E., 10.93; L. V. & N. P., 15.75.          Chicago thro', 58c.

In the thirteenth joint way-bill of the first shipment the words "Notify J. & W. Blaker" were omitted.

The joint way-bills covering the second shipment were dated November 17, 1877, but, like the thirteenth joint way-bill of the first shipment, they did not contain the words "Notify J. & W. Blaker" after the name of the consignee or owner. In other respects, except in the number of cattle carried, they were similar to those covering the first shipment.

The cattle of both shipments arrived in Philadelphia — the first on November 11, and the second on November 18 — and were immediately delivered by the Pennsylvania Railroad Company to the North Philadelphia Drove Yard Company, which was formed for the business of receiving, taking care of, and delivering live-stock to their owners or consignees. This company notified the Blakers of the arrival of the cattle, and delivered them to those parties. The Blakers were dealers in cattle, and had particular pens in the yard assigned to them. The cattle of both shipments were placed in these pens by the agent of the railroad company at the drove-yard station, and he then wrote on the thirteenth joint way-bill of the first shipment, and on all the joint way-bills of the last shipment from Waverly, under the name of the consignee or owner, these words: "Ac. J. & W. Blaker." On the day after they arrived and were placed in these pens, in each case, the Blakers sold the cattle and appropriated the proceeds. The cattle of both shipments were delivered by the railroad company to the drove-yard company without any direction to hold the cattle subject to

the order of the consignee, who was also the owner and shipper, and the cattle were delivered to the Blakers without such order. It does not appear that any demand was made by the railroad company, or by the drove-yard company, for anything to show the right of those parties to receive the cattle.

The bank transmitted the drafts for collection, with the carriers' receipts attached, to its correspondent at Newtown, Pennsylvania. The Blakers were notified of the receipt of the drafts, but failed to accept them, and they were protested for non-acceptance, November 27, 1877. They disposed of the cattle before the arrival of the drafts and carriers' receipts, and soon afterwards failed, and the drafts were not paid.

It appeared in evidence that Myrick had previously made numerous shipments of cattle from Chicago to Philadelphia, and taken similar receipts from the Michigan Central Railroad Company; that these cattle had been received by the North Pennsylvania Railroad Company and delivered by it at Philadelphia to the drove-yard company; that it had been the practice of that railroad company to deliver the cattle to the drove-yard company, and of the latter company to deliver them to the Blakers without the production of the carrier's receipt or any bill of lading, or any order of the shipper for their delivery. It also appeared that there was no knowledge on the part of the Commercial Bank at Chicago, or of its correspondent at Newtown, of any such practice; that drafts of Myrick, cashed by that bank, had accompanied previous shipments of cattle; that such drafts, upon notice to the Blakers of their receipt, had always been promptly paid, and that the bills of lading (the carriers' receipts in question) were not surrendered to the Blakers until such payment.

Upon these facts the Commercial National Bank originally recovered a verdict and judgment against the Michigan Central Railroad Company, the court below holding that the receipts of that company constituted contracts to carry the cattle from Chicago to Philadelphia, and deliver them there to the shipper or to his order; but the judgment was reversed by this court on the ground that a through contract for their carriage was not established by those receipts, and that the

question of whether or not there was such a contract for their carriage should have been submitted to the jury to determine from the circumstances of the case. *Myrick* v. *Michigan Central Railroad Company*, 107 U. S. 102. The present action was subsequently brought against the North Pennsylvania Railroad Company, the last of the series of railroad carriers in the line from Chicago to Philadelphia, for the non-delivery at Philadelphia of the cattle of both shipments to the order of the shipper, as designated in the receipts given to him at Chicago, and in the way-bills given at Waverly, that is, to his assignee, the plaintiff herein. Upon the evidence in the case, which developed the facts substantially as stated, the court directed a verdict for the plaintiff for the amount of its claim. A verdict was accordingly rendered for $34,271.41, which was the amount of the drafts.

*Mr. William Rotch Wister* and *Mr. George F. Edmunds* for plaintiff in error.

*Mr. Wayne McVeagh* for defendant in error. *Mr. J. A. Sleeper* filed a brief for same.

MR. JUSTICE FIELD, after stating the case, delivered the opinion of the court.

There is no doubt of the power of the Circuit Court to direct a verdict for the plaintiff upon the evidence presented in a cause, where it is clear that he is entitled to recover, and no matter affecting his claim is left in doubt to be determined by the jury. Such a direction is eminently proper, when it would be the duty of the court to set aside a different verdict, if one were rendered. It would be an idle proceeding to submit the evidence to the jury, when they could justly find only in one way. *Anderson County Commissioners* v. *Beal*, 113 U. S. 227, 241.

Upon the evidence presented, and there was no conflict in it, the law was with the plaintiff. The duty of a common carrier is not merely to carry safely the goods intrusted to him,

but also to deliver them to the party designated by the terms of the shipment, or to his order, at the place of destination. There are no conditions which would release him from this duty, except such as would also release him from the safe carriage of the goods. The undertaking of the carrier to transport goods necessarily includes the duty of delivering them. A railroad company, it is true, is not a carrier of live stock with the same responsibilities which attend it as a carrier of goods. The nature of the property, the inherent difficulties of its safe transportation, and the necessity of furnishing to the animals food and water, light and air, and protecting them from injuring each other, impose duties in many respects widely different from those devolving upon a mere carrier of goods. The most scrupulous care in the performance of his duties will not always secure the carrier from loss. But notwithstanding this difference in duties and responsibilities, the railroad company, when it undertakes generally to carry such freight, becomes subject, under similar conditions, to the same obligations, so far as the delivery of the animals which are safely transported is concerned, as in the case of goods. They are to be delivered at the place of destination to the party designated to receive them if he presents himself, or can with reasonable efforts be found, or to his order. No obligation of the carrier, whether the freight consists of goods or of livestock, is more strictly enforced. *Forbes* v. *Boston & Lowell Railroad Co.*, 133 Mass. 154; *McEntee* v. *New Jersey Steamboat Co.*, 45 N. Y. 34.

If the consignee is absent from the place of destination, or cannot, after reasonable inquiries, be found, and no one appears to represent him, the carrier may place the goods in a warehouse or store with a responsible person to be kept on account of and at the expense of the owner. He cannot release himself from responsibility by abandoning the goods or turning them over to one not entitled to receive them. *Fisk* v. *Newton*, 1 Denio, 45. If the freight consist, as in this case, of live-stock, the carrier will not, under the circumstances mentioned, that is, when the consignee is absent or cannot after reasonable inquiries be found, and no one appears

to represent him, relieve himself from responsibility by turning the animals loose. He must place·them in some suitable quarters where they can be properly fed and sheltered, under the charge of a competent person as his agent, or for account and. at the expense of the owner. Turning them loose without a keeper or delivering them to one not entitled to receive them would equally constitute a breach of duty for which he could be held accountable. These principles are firmly established by the adjudged cases, and rest upon obvious grounds of justice. Angell on Carriers, § 291.

The railroad company, defendant below, should, therefore, have given necessary instructions to the drove-yard company, which was its agent for the custody and care of the cattle, respecting their·delivery — that it should be made only upon the order of the consignee, who was also the owner and shipper. The joint way-bills given by the two companies at Waverly, equally with the original receipts given at Chicago, disclosed his name. Those joint way-bills were for the guidance of, and were used by, the conductors of both companies.

In the case of *The Thames*, 14 Wall. 98, it appeared that the purchaser of cotton at Savannah delivered it there to a vessel to be carried to New York, taking bills of lading, in which it was stated that the cotton was shipped by one Gilbert Van Pelt, and was to be delivered "unto order or to his or their assigns." Van Pelt was a member of a firm in New York, for which he purchased the cotton. Against the shipment he drew a draft on his firm, payable fifteen days after sight, and delivered it, with the bills of lading, to parties who obtained a discount of the draft from a bank in Atlanta. The draft and bills were at once forwarded to New York to an agent of the bank, to procure their acceptance by the firm. Before the draft became due the vessel arrived at New York and gave notice to the firm of the arrival of the cotton. That vessel had previously brought cotton in the same way for the firm, and the master of the vessel, knowing that the cotton was intended for the firm, and having no information from the bank's agent, or from any other source, of any other consignee or claimant, delivered to it the cotton, taking its receipt.

When the draft became due, two weeks afterwards, and was not paid, the cotton was demanded of the owner of the vessel by the bank's agent. In the action which followed it was contended by the owner that the delivery was justified, and that the vessel had discharged its obligation, but this court held that, though the delivery had been made in ignorance of any outstanding claim to the cotton, it was, nevertheless, a breach of the contract of affreightment, and that the agent of the bank could libel the vessel, which was bound for the proper delivery of the property, for the loss sustained. And the court said : " By issuing bills of lading for the cotton, stipulating for a delivery to order, the ship became bound to deliver it to no one who had not the order of the shipper, and this obligation was disregarded instantly on the arrival of the ship. And it is no excuse for a delivery to the wrong persons that the indorsee of the bills of lading was unknown, if indeed he was, and that notice of the arrival of the cotton could not be given. Diligent inquiry for the consignee, at least, was a duty, and no inquiry was made. Want of notice is excused when the consignee is unknown, or is absent, or cannot be found after diligent search. And if, after inquiry, the consignee or the indorsee of the bill of lading for delivery to order cannot be found, the duty of the carrier is to retain the goods until they are claimed, or to store them prudently for and on account of their owner. He may thus relieve himself from the carrier's responsibility. He has no right under any circumstances to deliver to a stranger."

The direction on the receipts given at Chicago, and on the way-bills of the first shipment from Waverly, to "notify J. & W. Blaker," in no respect qualified the duty of the carrier to deliver the animals to the order of the consignee. If they were consignees, the direction to notify them would be entirely unnecessary, because the duty of the carrier is to notify the consignee on the arrival of goods at their place of destination. In the case of *Furman* v. *Union Pacific Railway Co.*, recently decided by the Court of Appeals of New York, 106 N. Y. 579, it was held that placing in a bill of lading a direction to notify certain persons is a plain indication in the

absence of further directions, that they are not the consignees. The earlier case of *Bank of Commerce* v. *Bissell*, 72 N. Y. 615, is also in point on this subject. There the action was against the defendants as common carriers upon a bill of lading of a boat-load of wheat shipped at Buffalo for transportation to New York on account and order of the plaintiff. The bill of lading contained this direction: "Notify E. S. Brown, New York," and was given to the bank as security for a draft drawn by the shippers on Brown. With the draft annexed it was forwarded to New York, with an indorsement by the cashier of the bank that the wheat was subject to payment of the draft, and was to be delivered only on such payment. On the arrival of the wheat in New York it was delivered to Brown, and he became insolvent before the draft fell due. It was held that the defendants were not warranted by the bill of lading in delivering the wheat to Brown, and that the discount of the draft and its acceptance did not justify the delivery. It was also held that the fact that the plaintiff did not indorse over the bill of lading to any one in New York authorizing him to receive the wheat, did not relieve the defendants from the duty of holding it as plaintiff's property or subject to its lien; that they could have given notice to Brown, "and if neither he nor any one else came with authority to take delivery, they could, and it was their duty to have put the wheat in store."

It follows from these views that the defendant, the North Pennsylvania Railroad Company, in allowing the cattle to go into the possession of the Blakers, through its agent, the drove-yard company, without the order of the consignee, who, as stated above, was also the owner and shipper, became responsible for their value to the Commercial National Bank, which held his orders indorsed on the receipts for the shipments. It is true that the original receipts only bound the Michigan Central Railroad Company to carry safely the animals on its own road and deliver them safely to the next connecting line to carry on the route beyond. *Myrick* v. *Michigan Central Railroad Co.*, 107 U. S. 102. But the last carrier in the connecting lines was bound to deliver the animals at the place of

destination, and to the consignee there, or to his order, if they were made known to it on receiving the freight from the preceding connecting company. In this case there is no question that the company had such knowledge when the cattle were received. The destination and the name of the consignee appear upon the way-bills given at Waverly. There were only two places at which the cattle were, on their way from Chicago, reshipped, that is, taken from the cars, and, after a short interval of rest, replaced. Waverly was one of these places, and when they were reshipped there these way-bills, with a designation of the destination and consignee of the cattle, were made out.

The indorsement by Myrick to the plaintiff, the Commercial Bank of Chicago, of the receipts, taken on the shipment of the cattle, transferred their title, and gave to the bank the right to their possession, and, if necessary, to sell them for the payment of the drafts. The fact that the railroad company at Philadelphia had been in the habit of delivering cattle, transported by it, to the Blakers through the drove-yard company, without requiring the production of any bill of lading or receipt of the carrier given to the shipper, or any authority of the shipper, in no respect relieved the company from liability for the cattle in this case. It was not shown that the shipper or the bank which took the draft against the shipment, or its correspondent at Newtown in Pennsylvania, had any knowledge of the practice, and, therefore, if any force can be given to such a practice in any case, it cannot be given in this case where the party sought to be affected had no knowledge of its existence. In *Bank of Commerce* v. *Bissell*, cited above, the defendants offered to prove a custom in New York to deliver property under bills of lading to the person who was to have notice of its arrival. The evidence was rejected, and the Court of Appeals held that there was no error in its rejection, stating that if the custom were established it could not subvert a positive, unambiguous contract.

Numerous other assignments of error are presented for which a reversal of the judgment is asked, but the propositions of law embodied in them were not urged in the court

below, and, therefore, the fact that the court did not rule upon them constitutes no ground for interference with the judgment. The one exception taken was to the direction of the court upon the evidence to find a verdict for the plaintiff for the amount claimed. To that direction the defendant excepted, and it is at liberty to show, either that there was sufficient evidence to go to the jury, or that questions of law apparent upon the record would control the case in opposition to the direction. But this it has not done. As before stated, there was no conflict in the evidence, and the law upon it was clearly with the plaintiff.

The judgment is, therefore,

*Affirmed.*