(81 South. 241)

## OCEAN S. S. CO. OF SAVANNAH v. PEOPLE'S SHOE CO.   (1 Div. 80.)

(Supreme Court of Alabama.   Jan. 16, 1919.)

**1. CARRIERS ☞53—BILLS OF LADING—CONTRACT.**

Bills of lading are prima facie contracts of both carriage and delivery, and carrier must ordinarily deliver only in accordance with bill of lading.

**2. CARRIERS ☞82 — DELIVERY OF GOODS — BILL OF LADING—OWNERSHIP.**

Consignee in bill of lading is presumptively owner of goods, and must be treated by carrier as absolute owner until it has proper and valid notice to contrary, and a delivery to him without such notice will discharge carrier.

**3. CARRIERS ☞60 — TRANSFER OF TITLE TO GOODS—INDORSEMENT OF SHIPPING RECEIPT.**

An indorsement of a shipping receipt transfers title to goods.

**4. CARRIERS ☞86—FAILURE TO FIND CONSIGNEE—DUTY OF CARRIER.**

Where consignee of goods or indorsee of bills of lading cannot be found, it is carrier's duty to retain goods until claimed, or store them in a warehouse for and on account of owner, who is prima facie consignee or indorsee.

**5. CARRIERS ☞73—RIGHTS OF CONSIGNEE—CHANGE IN TIME AND PLACE OF DELIVERY.**

Unless consignor while goods are in transit changes instructions, consignee may change time and place of delivery.

**6. CARRIERS ☞174—REFUSAL OF SUCCEEDING CARRIER TO ACCEPT GOODS—DUTY OF CARRIERS.**

Where a succeeding carrier refuses to receive goods, tendering carrier must use reasonable diligence to notify consignor or consignee, whichever is entitled to such notice, and to take reasonable care of goods while awaiting instructions, and if carrier, at request of consignor or consignee, deposits goods in warehouse of a third party, its liability as a carrier or warehouseman is terminated, and it is not liable for subsequent loss, destruction, or injury to the goods.

**7. CARRIERS ☞89—REFUSAL OF CONSIGNEE TO ACCEPT GOODS—NOTICE TO CONSIGNOR.**

Assuming that it is duty of carrier to notify consignor of refusal of consignee to accept goods, mere failure to do so does not of itself constitute a conversion.

**8. CARRIERS ☞114 — TERMINATION OF LIABILITY OF CARRIER—LOSS OF GOODS.**

Where succeeding carrier refused to accept goods, and consignee instructed tendering carrier to store goods in warehouse, liability of tendering carrier to owner, whether consignee or consignor, for subsequent loss or injury to goods, terminated upon storing goods as instructed.

**9. CARRIERS ☞89—REFUSAL OF SUCCEEDING CARRIER TO ACCEPT GOODS—STORING GOODS —NOTICE TO CONSIGNOR.**

Assuming that consignor of interstate shipment was entitled to notice of storage of goods in a warehouse, consignee having refused to accept the goods, notice from initial carrier to consignor was sufficient, in view of the Carmack Amendment (U. S. Comp. St. §§ 8604a, 8604aa).

**10. COMMERCE ☞8(12) — INTERSTATE SHIPMENTS—WHAT LAW GOVERNS.**

Liability of connecting carriers in interstate shipment of goods is governed by federal statutes and law of carriers as construed by federal courts.

**11. CARRIERS ☞109—CONVERSION OF GOODS —WHAT LAW GOVERNS.**

Where goods were shipped from Alabama to Massachusetts, and there was a conversion of the goods in Massachusetts, in that carrier improperly stored goods in warehouse, where they were lost or injured, laws of Massachusetts must control in action in trover.

Certiorari to Court of Appeals.

Action by the People's Shoe Company against the Ocean Steamship Company of Savannah. There was a judgment of the Court of Appeals, affirming a judgment in favor of the plaintiff, and the defendant brings certiorari. Reversed and remanded.

See, also, 81 South. 245.

The following is the opinion of the Court of Appeals:

BRICKEN, J. This was a suit in conversion brought by the plaintiff against the defendant to recover the value of 400 pairs of shoes. The court gave the general affirmative charge for the plaintiff.

It appears that the plaintiff on the 28th day of May, 1912, consigned at Mobile a shipment of shoes to J. E. French & Co., at Rockland, Mass. At Mobile the shipment was delivered to the Louisville & Nashville Railroad Company. At Montgomery these shoes were delivered to the Central of Georgia Railway Company, which in turn delivered them to the defendant at Savannah, Ga., on June 5, 1912. When delivered to the Louisville & Nashville Railroad Company at Mobile, the goods were in good shipping condition, but when they were delivered to the defendant at Savannah they were not in good shipping condition. In the condition in which they were received these shoes were transported from Savannah to Boston by the defendant, and at Boston were tendered to the New York, New Haven & Hartford Railroad Company, to be delivered to the consignee at Rockland, about 20 miles away. The N. Y., N. H. & H. R. R. Co. declined to receive this shipment because the cartons were neither sealed nor corded. These goods were returned to the wharf of the defendant at Boston.

On June 20, 1912, the defendant addressed a letter to the consignees, informing the consignees that it had these goods in its possession at Boston, that the N. Y., N. H. & H. R.

R. Co. would not accept them for transportation, and requesting that the consignees have some express company call and receive these goods.

On October 2, 1912, an agent of the consignees called at defendant's place, and there left the notice of June 20, 1912, upon which was written the following: "As consignee of these goods, we decline to accept the same. So far as we are concerned, you may place in public storage for account, and at risk of the owner."

On October 5, 1912, the defendant notified in writing the Central of Georgia Railway Company, from whom it received these shoes, that the N. Y., N. H. & H. R. R. Co. had declined to receive them, that the consignee also had declined to receive them, and that they would be placed in public storage in Boston.

On October 7, 1912, the defendant had these shoes taken to and stored at the warehouse of the Quincy Market Cold Storage & Warehouse Company in Boston "for account and risk of the owners." The Quincy Market Cold Storage & Warehouse Company, after notifying J. E. French & Co. that these goods would be sold for the amount of charges then due at public auction on May 24, 1913, proceeded to, and did, sell them on that day.

Early in January, 1913, the plaintiff first learned that these shoes had not reached their destination. On February 24, 1913, the plaintiff learned that the goods had been refused by the N. Y., N. H. & H. R. R. Co., and on March 5, 1913, through an agent of the Louisville & Nashville Railroad Company at Mobile, the plaintiff was informed that these goods had been refused by the consignee and were at that time in "public storage at risk and expense of owner."

It is admitted that these goods were tendered to the N. Y., N. H. & H. R. R. Co. in the condition in which they were received by defendant at Savannah, Ga., and that the defendant at the time of receiving them had no knowledge that they would be rejected by the N. Y., N. H. & H. R. R. Co. Up to this point, therefore, the defendant discharged all of the duties of a common carrier that the law imposed upon it. This fact furnished defendant with the right and opportunity, by pursuing a proper legal course, of relieving itself as to this shipment of the relation of common carrier. The defendant had the right to store the goods in a suitable warehouse of a responsible party, at the risk of the owner.

After doing all this, the law imposed upon the defendant the duty of notifying the owner of the shipment of the fact and place of storage. Notice was given the consignee, J. E. French & Co., who informed the defendant in substance that they would not accept the goods, would have nothing to do with them, and, inferentially, that they did not own them. From this the defendant knew, or ought to have known, that the notice had not been given to the proper party, and that the proper party to notify under the circumstances was the consignor, at Mobile. The consignor at Mobile never received any notice from the defendant or anybody else that these goods had been stored in the warehouse of the Quincy Market Cold Storage & Warehouse Company in Boston at the risk and expense of this plaintiff. On March 5, 1913, plaintiff was informed, not by defendant, but by an agent of the L. & N. R. R. Co. at Mobile that these goods were "in public storage at risk and expense of the owner." This notice was clearly insufficient, and we therefore hold that the defendant failed to discharge this important duty that it owed the plaintiff. The Quincy Market Cold Storage & Warehouse Company never became the agent, under the circumstances, of this plaintiff.

The conduct of the appellant with reference to this shipment became unlawful, and its dominion and acts over the property of plaintiff amounted to a conversion. L. & N. v. Brewer, 183 Ala. 177, 62 South. 698; North Penn. R. R. Co. v. Commercial Bank, 123 U. S. 734, 8 Sup. Ct. 266, 31 L. Ed. 287; Buston v. Penn. R. R. Co., 119 Fed. 808, 56 C. C. A. 320; L. & N. R. R. Co. v. Duncan, 137 Ala. 455, 34 South. 988; Carrizzo v. N. Y., S. & W. R. Co., 66 Misc. Rep. 243, 123 N. Y. Supp. 179; Morris v. Burrows (Tex. Civ. App.) 180 S. W. 1108.

The assignments of error based upon the introduction of testimony relating to the value of the shoes are in our opinion without merit. It was competent to prove the value of the shoes at Mobile on the date of their shipment in May, 1912, and that their value was the same at Boston as at Mobile. While it is true that the evidence showed that, when the shoes reached Savannah, Ga., one of the 17 cases in which they were packed was broken open, and contained only 20 pairs of shoes and 4 empty cartons, yet this fact did not necessarily overcome plaintiff's statement that in the 17 cases there were 400 pairs of shoes. There was no evidence that the value of the shoes was different on the day of the shipment at Mobile from their value at the time of their conversion at Boston.

The court committed no error in the rulings upon the evidence in this case. The judgment is affirmed.

Affirmed.

Gregory L. and H. T. Smith, of Mobile, for appellant.

Boyles & Kohn, of Mobile, for appellee.

MAYFIELD, J. This is a certiorari to the Court of Appeals. The opinion of the Court of Appeals contains a full statement of all that is necessary to an understanding of this decision.

[1-4] Bills of lading are prima facie the contracts of both carriage and delivery; and the carrier must ordinarily deliver only in accordance with the bill of lading. The bill of lading is usually a contract between the carrier and the consignee. The bill usually designates the person and place to and at which delivery must be made. The consignee, the person to whom delivery is directed to be made, is presumptively the owner of the goods, and must be treated by the carrier as the absolute owner until he has proper and valid notice to the contrary; and a delivery to him without such notice will discharge the carrier. If the consignor desires to retain title or ownership in the goods, he must notify the carrier of such fact. In the absence of other directions, the goods

are deliverable only to the consignee named in the bill of lading, or to his assignee. Hutchinson on Carriers, vol. 1, §§ 177, 179; Lawrence v. Minturn, 17 How. 106, 107, 15 L. Ed. 58; Halliday v. Hamilton, 11 Wall. 564, 20 L. Ed. 214. Prima facie the legal title to goods shipped is in the party to whom the bill of lading is made or indorsed. The Thames, 14 Wall. 108, 20 L. Ed. 804. An indorsement of the shipping receipt transfers title to the goods. N. P. R. R. Co. v. Bank, 123 U. S. 738, 8 Sup. Ct. 266, 31 L. Ed. 287. Where the consignee of goods or indorsee of bills of lading cannot be found by the carrier, it is the duty of the latter to retain the goods until claimed or store them in a warehouse for and on account of the owner, who is prima facie the consignee or indorsee. 14 Wall. 107, 20 L. Ed. 804; 123 U. S. 734, 8 Sup. Ct. 266, 31 L. Ed. 287.

[5] As the consignee is the person to whom delivery is to be made, unless the consignor, while the goods are in transit, changes the instructions, the consignee of the owner has the right to change the time and place of delivery. Mr. Hutchinson thus declares the rule:

"It has been shown in the last chapter that the owner of the goods may at any time change his instructions to the carrier as to their destination, and may, if he chooses, countermand his previous orders in regard to them; and this he may do at any time during the transit. But the consignee is the presumptive owner, and unless the carrier is advised that the consignor has not parted with his title, and that it is to vest in the consignee only upon the performance of certain conditions, as, for instance, the payment of their price, a delivery at any place appointed by the consignee will discharge the carrier from his liability, even though it should not be the place appointed by the consignor." Hutchinson on Carriers, vol. 2, § 735.

[6] Where the succeeding carrier, as in this case, refuses to receive the goods, the tendering carrier must use reasonable diligence to notify the consignor or consignee, whichever is entitled to such notice, and to take reasonable care of the goods while awaiting instructions from the consignor or consignee; and if he, at the request of the consignor or consignee, whichever is entitled to notice, deposits the goods in a warehouse of a third party, his liability as a carrier or warehouseman is terminated, and he is not liable for subsequent loss, destruction, or injury to the goods. Hutchinson on Carriers, vol. 1, §§ 131, 132.

It should be noticed in this case, which we feel the Court of Appeals failed to take account of, that it was not the duty of this defendant, an intermediate carrier, to deliver the shipment to the consignee, but to the next connecting carrier. This it could not do, because the succeeding carrier refused to accept. On this refusal the defendant was under the duty to notify either the consignor or consignee, and to abide by that instruction, if reasonable. This it did. The sole fault found of the defendant's conduct by the Court of Appeals was the failure to notify the consignor after the refusal of the consignee to accept. If the consignee had accepted the goods, then, of course, there would have been no liability to the consignor.

[7] If the goods had belonged to the consignor, and not the consignee, at the time of notice to the consignee, a question we do not attempt to decide, nevertheless the bill of lading, the evidence of the contract of shipment, made the consignee the agent of the defendant to receive the shipment, and release the carrier, and, nothing else appearing, the bill of lading passed the title to the consignee, so far as the contract of shipment was concerned. If it had been the duty of the defendant carrier to have delivered the goods to the consignee, and not to the connecting carrier, and the consignee had declined to receive or accept them, there might be a duty to notify the consignor of the refusal; but the mere failure would not of itself constitute a conversion. Bolling v. Kirby, 90 Ala. 215, 222, 7 South. 914, 24 Am. St. Rep. 789.

[8] Here, however, was a notice to the consignee of the refusal of the succeeding carrier to accept, with inquiry for instructions, and the answer from the consignee, and his instructions followed, which ended this defendant's liability. If any unlawful conversion occurred, it was long after this and by the warehouse company, which was not the agent of defendant, but of the consignee or consignor, or whoever was the owner.

[9, 10] If it could be said, however, that the consignor was entitled to notice of nondelivery, the Court of Appeals shows that he was notified thereof some two months before the conversion by the warehouse company. Not by this defendant, it is true, but by the initial carrier, the company with whom the contract of shipment was made, and who was liable to the consignor, if any one was, for failure to deliver, and who was under a duty to notify plaintiff if anybody was. The Court of Appeals was in error in holding that this notice was not sufficient, because not given by the proper party, or because the name of the warehouse was not given.

This was an interstate shipment, and governed by the federal statutes and the law of carriers as construed by the federal courts. The conversion, if any occurred, was in the state of Massachusetts, and not in Alabama, although the contract of shipment was made in Alabama.

The Carmack Amendment (Act June 29, 1906, c. 3591, § 7, pars. 11, 12, 34 Stat. 595 [U. S. Comp. St. §§ 8604a, 8604aa]) affects the liability of the receiving or initial carrier, but does not make the intermediate carrier

liable for the acts of other connecting carriers. It makes the initial or receiving carrier the principal, and the other connecting carriers its agents, and makes it liable for the wrongs of any succeeding carriers; but it does not make each of the connecting carriers liable as for the wrongs of any other connecting carrier. A. C. L. v. Riverside Co., 219 U. S. 186–196, 31 Sup. Ct. 164, 167, 55 L. Ed. 167; Root v. G. N. R. R. Co., 45 N. Y. 524.

In the first case above cited the constitutionality of the Carmack Amendment was upheld and construed, and, among other things, it is said:

"The receiving carrier makes the rate and the route, and as the agent of every such connecting carrier executes a contract which is to bind each of them 'severally, but not jointly'; one of the terms of the agreement being that each carrier shall be liable only for loss or damage occurring on its own line. Through this well-known and necessary practice of connecting carriers there has come about, without unity of ownership or physical operation, a singleness of charge and a continuity of transportation greatly to the advantage of the carrier and beneficial to the great and growing commerce of the country. * * *

"In substance Congress has said to such carriers: 'If you receive articles for transportation from a point in one state to a place in another beyond your own terminal, you must do so under a contract to transport to the place designated. If you are obliged to use the services of independent carriers in the continuance of the transit, you must use them as your own agents, and not as agents of the shipper.' It is, therefore, not the case of making one pay the debt of another. The receiving carrier is, as principal, liable not only for its own negligence, but for that of any agency it may use, although, as between themselves, the company actually causing the loss may be primarily liable."

We do not think any of the cases cited in the opinion of the Court of Appeals support the holding. The case of L. & N. R. R. Co. v. Brewer, 183 Ala. 172, 62 South. 698, holds that the carrier is not liable to the shipper as for failure to deliver, where the goods were carried to the end of its line and delivered to a connecting carrier, who stored the goods in a warehouse, and mailed notice to the consignee. In that case the action was against the initial carrier, which, under the Carmack Amendment, was liable as for any wrong of any connecting carrier; and yet it holds that, if the facts alleged in the plea were true, there was no liability. The facts set up in that plea made no stronger case for the defendant than did the undisputed facts in this case, as found by the Court of Appeals. It is true a state statute was invoked in that case, which cannot apply here, because the place of delivery is in Massachusetts; yet the notice to the consignee is proven without dispute, and that he either consented to or directed the storage in the warehouse. While it does not appear that the consignor also had notice before the storage in the warehouse, he did have notice thereof more than two months before the conversion, and, if he had desired so to do, could have had the goods by paying the proper and lawful charges.

Moreover, it is difficult to understand why this plaintiff should have waited nearly a year before making any inquiry as to the goods or shipment, if it really owned the goods, or was even acting as agent for the consignee in shipping. The plaintiff either owned the goods, and the consignee was its agent to receive and receipt for them, or the consignee owned them, and the consignor was its agent to ship them. Both parties seem to have denied ownership of them, when they were shipped, and when they would have been delivered, but for the dispute between the consignor and consignee as to whose goods they were. The dispute was not that each claimed to own the goods, but that each claimed that the other owned them. It was not until there appeared to be an opportunity to fix liability on the carrier that the consignor and consignee agreed among themselves as to who owned the goods.

As was said by this court in an early case, the duties are not all on one side as to shipments of freight. The consignor and consignee owe duties to the carrier, as well as those owing to them by the carrier. In this early case it was said, after stating the duty of the carrier to store in his own warehouse, if he had one:

"It seems that the duty of the company is performed, and their responsibility at an end, if, after carrying the goods to the place of destination, and keeping them safely for such a length of time as to afford the owner an opportunity, by the use of due diligence, to remove them, they deposit them in the warehouse of a responsible person, for and on account of the owner or consignee. In such a case the warehouseman with whom the goods are stored becomes the agent or bailee of the owner. It must be remembered that in contracts for the carriage of goods the obligation is not all on one side. It is as much a part of the contract that the owner or consignee shall be ready at the place of destination to receive the goods when they arrive, or within a reasonable time thereafter, as that the carrier shall transport and deliver them. If, however, the consignee is dead, or absent, or fails to receive the goods, the carrier is not justified in abandoning them, unless, perhaps (for even this is by no means clear), where the consignee, after actual notice of the arrival of the goods, refuses to receive them. See Fisk v. Newton, 1 Denio [N. Y.] 45 [43 Am. Dec. 649]; Smith v. Nashua R. R., 27 N. H. 86 [59 Am. Déc. 364]; Hemphill v. Cheine, 6 Watts & S. [Pa.] 62; Pierce, R. R. 448, 449; 1 Parsons, Con. 660. On the contrary, it is his duty to secure them for the owner. He may, if he so elect, keep them as bailee on deposit; or, if he has come under no obligation, either by the terms of his agreement, or the course of business, to hold the goods as bailee, he has the right to leave them in store with some responsible third person, and thus dis-

charge himself from all further liability." Ala. & Tenn. Rivers R. R. Co. v. Kidd, 35 Ala. 209.

[11] The action being in trover, and the conversion the tort, if any having been committed in Massachusetts, the laws of that state must control, unless the contract should otherwise provide. No statute of that state is cited or relied upon by the Court of Appeals which would change the common-law rules on the subject, as declared by this court and the Supreme Court of the United States, which we have cited above; and,. as before stated, so far as the contract of shipment is concerned, it is governed and controlled by the federal laws and decisions.

The decisions of the Supreme Court of Massachusetts, however, seem to be in accord with our own to the extent of preventing the affirmative charge from being given against this defendant, under the facts as stated by the Court of Appeals.

In the case of Barker v. Brown, 138 Mass. 340, the contention was made, as here, that the consignor should be notified before the carrier could discharge its liability as carrier, and that court held, as did ours in ·Kidd's Case, 35 Ala. 209, that such notice was not required. The Massachusetts court said:

"When a reasonable time had elapsed, it was the right of the railroad company to store the goods with some suitable and responsible warehouseman, and thus discharge itself from further liability. It was not compelled to determine the dispute which had arisen between the plaintiff and the owner, and such storing of the goods would be equivalent to a delivery thereof to whichever of the two parties was entitled thereto. * * *

"It is the contention of the plaintiff that, the Shephard & Morse Lumber Company not having been notified to remove the goods, the carrier could not deposit them so as to subject them to the warehouseman's lien, and that a lien could not be created except with the assent of the owner. We are not aware that it has ever been held to be the duty of the carrier to notify the owner or consignor of goods of a refusal to accept them before he can terminate his own liability as carrier, and thereafter hold them himself, or transfer them to another, to hold as a warehouseman. It is for the owner or consignor of goods to have some one at the place of delivery, when their transit is completed, to accept them. If he does not, the rule which imposes a duty upon the carrier to hold them himself as warehouseman, or to store them in some convenient place, sufficiently protects the goods he has shipped. It would be unreasonable that the carrier should not be allowed to terminate his contract of carriage until after notice to the consignor and subsequent assent by him to the storage of the goods. The assent of the owner or consignor of goods that a lien thereon for storage shall, under certain circumstances, be created, is one to be inferred from the contract of shipment he has made. If his consignee cannot be found, or, being found, refuses to accept, he must be held to authorize the storage of the goods. If the carrier is authorized to store them, it does not require argument to show that he may subject them to a lien for the necessary storage charges, and that the owner cannot thereafter sell or transfer them so as to divest the lien."

The law seems to be the same in New York as in Alabama and Massachusetts on this subject, as to duty to notify shipper or consignor, when consignee refuses to accept. See the case of Manhattan Rubber Co. v. Chicago, B. & A. R. R. Co., 9 App. Div. 172, 41 N. Y. Supp. 83.

It results that certiorari will be awarded, and that the judgment of affirmance of that court set aside, and the cause remanded to that court for further proceeding, in accordance with this opinion.

Application granted, and· reversed and remanded.

All the Justices concur.