[No. 29086. Department One. November 30, 1943.]

DOHRMANN HOTEL SUPPLY COMPANY, *Appellant*, v. OWL TRANSFER & STORAGE COMPANY, *Respondent.*[1]

[1]Reported in 143 P. (2d) 441.

*Preston, Thorgrimson, Turner, Horowitz & Stephan,* for appellant.

*Brethorst, Holman, Fowler & Dewar,* for respondent.

JEFFERS, J.—This action was instituted by the Dohrmann Hotel Supply Company, a corporation, against Owl Transfer & Storage Company, a corporation, in the superior court for King county, to recover the reasonable replacement cost and value of certain goods delivered to defendant as a common carrier, and alleged to have been negligently damaged by defendant.

The complaint, in substance, alleged that the defendant was operating as a common carrier of freight (local cartage) in the city of Seattle; that, on or about October 10, 1941, plaintiff delivered into the care and custody of defendant as a common carrier of freight, and defendant, for compensation, *accepted as a common carrier of freight, certain goods, wares, and merchandise for delivery to the Seattle Quartermaster Depot, Port of Embarkation, 1518 South Alaskan Way, Seattle, Washington*; that, while such goods were in the custody of defendant, *and prior to delivery to pier A,* the goods were negligently damaged by defendant, and became a total loss; that, because of the damaged condition of the goods, the United States government refused to accept delivery of them, and plaintiff was compelled to, and did, replace them in fulfillment of its contract with the United States government.

Defendant, by its answer, admitted the allegations of the complaint, except the allegations that the goods were damaged prior to their delivery at pier A by defendant, that the goods were negligently damaged by defendant, and that they were a total loss, and the allegation as to the claimed replacement costs, which allegations defendant denied. Defendant alleged affirmatively that, at the time plaintiff's goods were damaged to some extent unknown to defendant, by chemicals used in extinguishing a fire in defendant's warehouse, defendant had ceased to act as a common car-

rier, and was, for the sole benefit of plaintiff, acting as a gratuitous bailee of plaintiff's goods.

Plaintiff, by its reply, denied the affirmative matter contained in defendant's answer.

The facts in this case are not in dispute, and may be stated as follows: About three-fifteen o'clock on the afternoon of October 10, 1941, Perry McNeely, shipping clerk for plaintiff, called defendant's dispatcher, and told him that plaintiff had a shipment of goods for the United States army engineers, to be put on the dock immediately. In answer to the call, defendant sent one of its large trucks, in charge of a Mr. O'Bryon, to plaintiff's shipping rooms, which are located at the corner of Fifth avenue and Virginia street. The truck arrived about four o'clock, and the goods were loaded, this operation consuming about forty-five minutes. As soon as the goods were loaded, the driver of the truck proceeded immediately to pier A, where he arrived about six o'clock. Upon his arrival at pier A, Mr. O'Bryon presented his papers to the United States engineers' department, which refused to permit him to unload the goods at pier A, directing him to deliver the goods to the Alaska Steamship Company's dock. The driver proceeded immediately to the last named dock, but arrived there too late, as the dock had been closed for the day. Mr. O'Bryon then called Julius Daverso, president of defendant company, and told him what had happened. Mr. Daverso attempted to call plaintiff on the telephone, but plaintiff's place of business was closed, so Mr. Daverso told the driver to take the goods to their garage at 912 Dearborn street. This garage was a frame building with a concrete floor, and had been under lease and used by defendant for a period of from four to six months.

Mr. Frank Daverso, secretary of defendant, was the last man to leave the building the morning of the fire. He had been in charge of the loading of three·trucks with merchandise belonging to McKesson-Robbins, for Alaska shipments. These three trucks came into the garage about twelve-thirty a. m., October 11th. On the back of one of

them were three boxes marked "acid," and on the boxes was a sign "inflammable." Mr. Daverso testified that, after these McKesson trucks had been driven into the garage with their loads, he went out and locked the door; that at that time everything looked safe, and he was the last man to leave the garage. He testified that he was in personal charge of the loading of the McKesson trucks, and that there had been no smoking while they were being loaded. There is no testimony that there was any smoking on or about these trucks at any time.

About one-thirty, or about an hour after Mr. Daverso had left the garage, he was called by the police department and informed that the garage was on fire. Mr. Daverso went to the garage immediately, and upon arriving there found that some of the trucks had been driven out of the building on their own power, among them the truck loaded with the McKesson goods, upon the back part of which was the acid. There was some fire on this truck, and the canvas top and lattice work had been burned off, but aside from scorching, the truck was not damaged and there had been no fire about the cab. There had been fire in one of the other trucks which stood alongside the McKesson truck, but that fire had been extinguished. The fire in the McKesson truck was apparently in the back end. There had been some fire in the rafters and roof of the building immediately over the McKesson truck.

The truck loaded with plaintiff's goods was parked immediately back of the McKesson truck upon which the acid was loaded. It does not appear that the fire was actually communicated to the truck upon which plaintiff's goods were loaded. Mr. Julius Daverso testified that in his opinion the damage to plaintiff's goods was caused by some chemical used by the firemen, as the goods looked stained. There was no testimony that the goods were otherwise damaged.

There was no testimony that there had been any accident in the movement of the McKesson trucks, either before or after they were driven into the garage. There is no testi-

mony that anyone knew where or how the fire started, other than as may be inferred from the foregoing facts.

The goods in question were delivered to defendant as a common carrier, and accepted by it as such, to be by it delivered to the consignee at pier A.

Mr. McNeely testified that he knew the Alaska Steamship Company's dock closed at six o'clock, and that trucks had to be in line there at three p. m., to have their papers examined, but that he did not know there was any time limit at the army dock, pier A.

The following stipulation, signed by counsel for the respective parties, was filed in the cause prior to the making and entry of the findings of fact, conclusions of law, and judgment:

"It is Hereby Stipulated by and between counsel of the respective parties that the record may be supplemented as follows:

"That the shipment in question, after loading, was immediately taken to the United States Engineers' Department at Pier A; that the Engineers' Department refused to permit the shipment to be unloaded there but directed the defendant to deliver it to the Alaska S. S. Company's pier; that the defendant proceeded immediately to the Alaska S. S. Company's pier but could not unload there because the dock was then closed for the day."

We are of the opinion the findings of fact made by the trial court are supported by substantial evidence, and might well have been set out as the established facts in this case, without further reference to the testimony, but, in view of the fact that error is based upon four of the findings, we thought it proper to set forth the evidence upon which the findings are based. However, being of the opinion that the findings are amply sustained by the evidence, the question presented is whether or not the conclusions of law and judgment are supported by the findings.

In order that there be no question as to the factual situation found by the trial court, we set out the findings in full, except as to the repetition of the words "goods, wares and merchandise," to which we shall refer as goods.

Findings one and two merely state that plaintiff is a corporation admitted to do business in this state, and has paid all fees owing to the state, and that defendant is a corporation operating as a common carrier in the city of Seattle, under a permit issued by the state of Washington.

The findings continue:

"3. That prior to October 10, 1941, plaintiff contracted to sell to the United States of America certain goods which were to be delivered by it f. o. b. U. S. Engineers Army Transport, Pier A, 1518 South Alaskan Way, Seattle, Washington.

"4. That at or about the hour of 5:00 o'clock p. m., October 10, 1941, plaintiff loaded certain goods on defendant's truck, to be delivered by the defendant to U. S. Engineers Army Transport, Pier A, 1518 South Alaskan Way, Seattle, Washington.

"5. That the defendant's truck proceeded immediately from the plaintiff's warehouse where it had been loaded to U. S. Engineers Army Transport, Pier A, 1518 South Alaskan Way, Seattle, Washington. That the defendant presented the bill of lading and the said goods to the U. S. Engineers Army Transport at said Pier A, but the said consignee refused to permit the said goods to be unloaded at the said pier and directed the driver of the defendant's truck to take the said goods to the Alaska Steamship Company's dock at Seattle, Washington. That immediately thereafter the said goods were taken to the Alaska Steamship Company's dock in Seattle, Washington, but they could not be unloaded there, as the dock was closed for the day. That thereupon the driver of the defendant's truck called the president of the defendant corporation to learn what disposition should be made of the goods; that the defendant's president then called the plaintiff's office by telephone but received no answer, as the office was closed for the day; that thereupon the president of the defendant corporation directed the driver to store the said truck with the said goods in defendant's garage in Seattle.

"6. That at or about 2:00 a. m., October 11, 1941, a fire of undetermined origin started in another truckload of goods parked near the truck on which the plaintiff's goods were loaded, and the plaintiff's goods were damaged in the stipulated sum of $939.96 by the said fire.

"7. That there were parked in said garage at the time of the said fire four trucks, together with their loads of goods,

besides that of the one loaded with the plaintiff's goods, all of which trucks were owned and operated by the defendant. That the said garage had been used for some time prior thereto by the defendant for the storing of its trucks and goods.

"8. That neither the defendant nor its agents were in any wise negligent in the handling of the plaintiff's goods, nor were they negligent in any manner whatsoever in the storing of the trucks and goods in the garage or in the operation of the said garage, nor was the said fire caused by the defendant's negligence.

"9. That the defendant was to be paid by the plaintiff for the cartage of the said goods to U. S. Engineers Army Transport, Pier A, Seattle, Washington.

"10. That the defendant tendered the goods for delivery at the place it was directed by the contract of carriage to make the tender; that the defendant, through no fault of its own, having done all that it could to effect delivery, was left with the responsibility of caring for the goods overnight; and that it then became a bailee and no longer had the status of a common carrier."

Based upon the above findings, the court concluded that judgment should be entered dismissing plaintiff's complaint. Judgment was accordingly entered on January 8, 1943, and this appeal by plaintiff followed.

Appellant assigns error on the entry by the trial court of findings of fact Nos. 5, 6, 7, and 10, and conclusion of law No. 1; in dismissing appellant's action; and in entering judgment for respondent.

We may say here that appellant does not point out where or in what respect the findings of fact are not sustained by the evidence.

It is the general contention of appellant that respondent never made delivery of the goods to the consignee, and consequently the goods were still in transit at the time of the fire, although stored in respondent's garage; that, as respondent was still a common carrier of the goods at the time they were damaged, it was liable for such damage, regardless of whether or not the damage to the goods was caused by the negligence of respondent.

On the other hand, respondent contends that, when it

made a proper tender of the goods to the consignee at pier A, in accordance with the contract of carriage, it did all that the law required it to do, or that it could do; and that, when the tender was refused at pier A, not because the goods arrived there too late in the day, or because of a desire to inspect them, but for some reason not appearing in the record other than that the consignee desired to have them delivered at the Alaska Steamship Company's dock, the status of respondent immediately changed to that of a warehouseman, and respondent became liable for the goods in that capacity only.

We think it apparent that the first question to be determined is the status of respondent, in relation to the goods at the time they were damaged, and the solution of that question in this case depends upon the circumstances surrounding the alleged tender. In other words, do the facts as found by the trial court sustain the conclusion that a proper tender was made to the consignee at pier A, and such tender refused?

It may be admitted that this court has adopted what may be termed the general rule, that the liability of a carrier as such continues after the goods received by it for transportation have arrived at their destination and until the consignee has been notified of their arrival and has had a reasonable time and opportunity to call for and take them away. *Fisher v. Northern Pac. R. Co.*, 49 Wash. 258, 94 Pac. 1073, 126 Am. St. 867; *Lagomarsino v. Pacific Alaska Nav. Co.*, 100 Wash. 105, 170 Pac. 368; *Burr v. Adams Express Co.*, 71 N. J. L. 263, 58 Atl. 609; and other cases cited by appellant.

It may also be admitted that it is the law in this state that the relationship of shipper and common carrier is not changed to that of bailor and bailee, where the goods are received by the carrier for shipment in its warehouse, and are destroyed by fire before actual shipment, where the contract of carriage is one for through shipment from the residence of the shipper to the consignee at the point of destination. *Kettenhofen v. Globe Transfer & Storage Co.*,

70 Wash. 645, 127 Pac. 295, Ann. Cas. 1914B, 776, 42 L.R.A. (N.S.) 902; *Southern R. Co. v. Smith*, 125 Ky. 656, 102 S. W. 232; and other cases cited by appellant.

In none of the cases cited was a tender of the goods by the carrier to the consignee involved, under circumstances such as we have in the instant case, or at all.

In the ordinary case of a common carrier such as a railroad or steamship company, the contract of carriage does not call for delivery to the consignee other than on the premises of the carrier. From the very nature of the business transacted by carriers of the type mentioned, they must necessarily, as a part of such business, provide some place where goods can be delivered by the shipper until actually shipped, and some place where the goods, after reaching their destination, can be stored or held until the consignee has been notified of their arrival, and has had a reasonable time and opportunity to call for and take them away.

The question, then, to be decided in the class of cases first above referred to, i. e., whether or not the relationship of the carrier to the goods has changed to that of a warehouseman, is dependent upon whether or not the facts show that the consignee has had a reasonable time and opportunity after notice of the arrival of the goods to call for and take them away.

In the second class of cases cited, the question of whether or not the relationship of the carrier to the goods is that of carrier or warehouseman is dependent upon whether or not the facts show that the carrier received the goods at its warehouse or other designated place as ancillary to its undertaking to carry the goods to their destination, for the convenience of the carrier and as a part of and in furtherance of its business as such carrier. It is apparent, we think, that in the last class of cases referred to the contract of carriage contemplates a warehousing of the goods as a part of the contract of carriage.

It is easy to state a general rule and to find cases wherein such rule is announced, but, when the facts in a cited case

to which the rule is applied are considered, the case may be no authority for another case which presents different facts. We are satisfied that the cases cited by appellant, and the general rules therein announced, are not controlling in the instant case, because of a difference in the factual situations presented.

■ The difference between a carrier such as a railroad company or a steamship company and a carrier such as respondent, as regards the situation upon which the determination of the status of the carrier depends, is shown by the case of *Sheehan v. American Railway Express Co.*, 91 Pa. Super. Ct. 71. While we appreciate this is not a court of last resort, we adopt the rule hereinafter stated as a proper statement of the rule to be applied herein. In the cited case, plaintiff, as shipper, delivered to the defendant at New York a trunk to be delivered at 700 Pennsylvania avenue, Warren, Pennsylvania. The trunk was damaged by fire in the office of the defendant, after its arrival at Warren. The court, in discussing the contract of carriage, stated:

"By the contract between plaintiff and defendant the latter undertook not only to carry the trunk from New York to Warren but also to deliver it to 700 Pennsylvania Avenue at point of destination. . . . In this respect the contract differs from the ordinary transportation of goods by freight or the usual carriage of a person's baggage in connection with his conveyance as a passenger of the common carrier. In these latter cases the liability of the carrier continues *until the consignee of the freight, or the passenger, as the case may be, has had reasonable time to call for and take away his goods or baggage.* But where the carrier is obligated to make delivery, its liability as carrier continues until it delivers the goods *or offers to deliver them at the place of delivery and is unable to make delivery through no fault of its own. If unable to make delivery at the place specified in the contract* its liability thereafter is that of a warehouseman and not a common carrier; just as the liability of a carrier for a freight shipment or a passenger's baggage, after the expiration of a reasonable time for the consignee or passenger to call and receive it, is that of a warehouseman." (Italics ours.)

While the case of *Keystone Motor Freight Lines v. Brannon-Signaigo Cigar Co.,* 115 F. (2d) 736, and other cases cited by appellant on the question of tender, were apparently decided upon the theory that an attempted delivery by the carrier to the consignee, after office hours, was not a proper tender, it is apparent that these cases recognize that if a proper tender had been made by the carrier its liability as a carrier would have ceased, for it is stated in the case last cited:

"Since a proper tender of delivery would have reduced the liability of the carrier to that of a warehouseman, the solution of the question of its status became necessary to a decision of the case, and depended wholly upon the circumstances surrounding the alleged tender."

Let us now see what the general rule is, where a tender of the goods by the carrier to the consignee is involved. The rule is stated in 9 Am. Jur. 839, § 688, as follows:

"Where the consignee of goods refuses to receive them, although thereafter the carrier's responsibility as such ceases, the latter is not discharged from all liability therefor, but it becomes at once the bailee thereof for the owner, and accordingly must have the goods stored either in its depot or in some warehouse where they will be reasonably safe and free from injury. *But after it has once made a proper tender of goods,* a carrier cannot be held to a more severe responsibility than that of warehouseman." (Italics ours.)

To the same effect is 13 C. J. S. 360, § 179.

It may be admitted in the instant case that there was no actual delivery of the goods by the carrier to the consignee. However, it does not appear that the consignee refused to allow the carrier to unload them at pier A because they arrived there too late, or for any reason other than that the consignee desired to have them taken to the Alaska Steamship Company's dock.

In considering what, from a legal standpoint, are the duties of the carrier in the instant case, the contract of carriage is of first importance. See *Kettenhofen v. Globe Transfer & Storage Co.,* 70 Wash. 645, 127 Pac. 295.

The contract of carriage in this case did not call for a delivery of the goods at the Alaska Steamship Company's dock, nor did the contract contemplate such a delivery, because appellant's shipping clerk knew at the time the goods were loaded that it would be impossible to make delivery at the dock last mentioned. The contract called for a delivery at pier A. Neither did the contract call for or contemplate a warehousing of the goods by respondent, for its convenience, or at all, but the contract contemplated a delivery by the carrier that night, to the army engineers at pier A. We are therefore convinced that the question to be considered is whether or not a proper tender was made at pier A, and not at the Alaska Steamship Company's dock.

In a note to the case of *Denver & R. G. R. Co. v. Peterson,* 30 Colo. 77, 69 Pac. 578, 97 Am. St. 76, at p. 92, we find the following statement:

"In case the consignee refuses to accept the goods when tendered to him, the stringent liability of the carrier cannot be continued. Thereafter it is liable as a warehouseman only."

While the case of *Beedy v. Pacey,* 22 Wash. 94, 60 Pac. 56, is based upon a claimed conversion by the carrier, and the case was decided upon that theory, the following statement is found in the opinion:

"The *ordinary duty of a carrier,* where the consignee refuses to receive the goods shipped, is to store them either in his own warehouse or that of some responsible third party, notify the shipper or owner of such refusal, and hold them for a reasonable time subject to further orders." (Italics ours.)

In the case of *North Pennsylvania R. Co. v. Commercial Nat. Bank,* 123 U. S. 727, 31 L. Ed. 287, 8 S. Ct. 266, it is stated (p. 734):

"If the consignee is absent from the place of destination, or cannot, after reasonable inquiries, be found, and no one appears to represent him, the carrier may place the goods in a warehouse or store with a responsible person to be kept on account of and at the expense of the owner. He

cannot release himself from responsibility by abandoning the goods or turning them over to one not entitled to receive them."

■ We appreciate that the above statement indicates a different situation than here presented, but it also indicates that it is not necessary to make an actual delivery to the consignee before the status of a carrier changes to that of a warehouseman, and in our opinion, it bears out the contention of respondent that, under a contract of carriage such as here involved, the carrier has made a proper tender when it offers the goods to the consignee at the designated destination. While the rule announced in the case last above referred to would seem to be in conflict with those cases cited by appellant wherein it was announced that a tender of the goods after office hours was not a proper tender and such as would reduce the liability of a carrier to that of a warehouseman, the difference in the rule announced is due to the difference in the factual situation presented. As a matter of fact, an analysis of the cases shows that usually the question of whether or not a proper tender has been made is a question for the jury or the court to decide, upon a consideration of all the circumstances surrounding the alleged tender.

In connection with respondent's contention that a proper tender was made in the instant case, we again call attention to the case of *Sheehan v. American Railway Express Co.,* 91 Pa. Super. Ct. 71.

In a note to *Schmidt v. Blood,* 9 Wendell (51 N. Y.) 268, 24 Am. Dec. 143, at p. 147, we find a reference to Hutchinson on Carriers, § 356.

■■ "It therefore frequently becomes a question of importance as well as of difficulty to determine when and under what circumstances the relation of carrier to the goods has ceased and their custody has become a mere bailment. It may be stated as a general proposition that *when the carrier has done all that the law requires of him towards accomplishing a delivery, and from any cause fails to effect it, and the goods are of necessity continued in his possession, he*

*from that time becomes responsible only as a depositary."* (Italics ours.) Hutchinson on Carriers (2d ed.), § 356.

In line with the authority last above cited, we find in 4 R.C.L. 749, § 218, the statement that the responsibility of the carrier as such continues until it has made an actual delivery, *or done that which may be considered as equivalent to or a substitution for such delivery.*

The case of *Columbia Motors Co. v. Ada County*, 42 Idaho 678, 247 Pac. 786, 48 A.L.R. 950, announces the rule that

"The status of the common carrier is to be determined by what it did, and what under the law it was its duty to do when delivery was refused by the consignee. The rule of law in this case which establishes the status of the common carrier as that of a warehouseman is well stated in 10 C. J. 269."

The statement in 10 C. J. referred to in the foregoing quotation is practically the same as the following statement found in 13 C. J. S. 360, § 179:

"Where the consignee fails or refuses to receive the goods shipped, it is the duty of the carrier to store the goods either in its own warehouse or in that of some responsible third person, at the shipper's expense, and to hold the goods subject to the order of the shipper for a reasonable time. It has no right to abandon the goods or unnecessarily to expose them to loss or damage, nor to convert the freight to its own use or to dispose of it contrary to law. The carrier is not required, however, to store the goods at the place of destination, but may remove them to the most convenient and suitable place of storage, provided it holds itself ready to deliver on demand and in so doing, even without the knowledge or consent of the shipper, the carrier is not guilty of a conversion.

"Where the carrier has complied with its duty to warehouse the goods, its strict common-law liability as insurer is at an end, and thereafter its relation to the goods is only that of warehouseman or bailee, and it is bound to the exercise of ordinary care in preserving them."

It seems to us indisputable that, under the contract of carriage and the law, respondent, as a carrier, was obligated only to deliver safely the goods to pier A, and there make

a tender of them to the consignee. This respondent did, and having done all that it could or that the law required of it, respondent's status immediately changed to that of a warehouseman, and it became liable for the goods only in the latter capacity. The driver could not contact the shipper, as its office was closed, and so, after the refusal of the consignee to accept the goods at pier A, respondent found itself in possession of the goods.

Under these circumstances, we do not think it must be held as a legal proposition that, when respondent's driver proceeded to the Alaska Steamship Company's dock, such act constituted an election on the part of respondent to continue the contract of carriage. We are of the opinion that, in proceeding to the dock last mentioned, and thereafter storing the goods in its garage, respondent was doing only that which it was required to do as a warehouseman; that is, provide a reasonably safe place to store the goods until appellant could be contacted and its wishes in regard to the disposition of the goods ascertained.

We are further of the opinion that a consignee cannot change the contract of carriage between the shipper and the carrier by a mere direction that the goods be delivered to some place other than that indicated in the contract.

We are satisfied that the trial court was, by the facts in this case and the law applicable thereto, justified in holding that respondent had done all that it could or that the law required of it to make a proper tender of the goods to the consignee, and that, having done this, upon the refusal of the consignee to permit it to unload the goods at pier A, respondent's status immediately changed to that of a warehouseman.

Having concluded that the status of respondent became that of a warehouseman, upon its tender of the goods to the consignee at pier A and the refusal of the consignee to there accept the goods, what, then, became the liability of respondent to appellant, if any, for damage to the goods while in respondent's garage?

In view of the conclusion we have reached on this ques-

tion, it becomes unnecessary to decide whether respondent was a gratuitous bailee or a compensated bailee.

■ On the trial, appellant rested after proving delivery of the goods to respondent under the contract of carriage, a demand for the return of the goods, and the failure on the part of respondent to return them undamaged. It may be admitted that, under the law, this made out a *prima facie* case under appellant's pleadings.

Respondent then introduced proof that the goods were damaged as the result of a fire of undetermined origin in its garage. There were no facts indicating that the fire was caused by respondent's negligence. The duty was then cast upon appellant to go forward and show that the fire resulted from some negligence of respondent.

We are of the opinion that the trial court correctly held that appellant wholly failed to show any negligence on the part of respondent.

While other cases are cited by both appellant and respondent on the question here presented, we are of the opinion that the instant case is controlled by the rule announced in *Birk v. Bremerton,* 137 Wash. 119, 241 Pac. 678. In the cited case, after a recitation of the facts, we stated:

"The law with reference to the liability of warehousemen is well settled. A warehouseman is bound to exercise ordinary diligence only. [Citing case.] When, however, it is shown that the loss is occasioned by larceny, burglary, fire, or other cause which of themselves do not point to negligence on the part of the bailee, the bailee has then met the *prima facie* case made against him by his failure to return the goods, and the burden of proof as to negligence then rests upon the plaintiff as in any other case of alleged negligence. [Citing cases.]"

■ There was no testimony in this case which would have justified the trial court in finding that respondent was negligent in handling any of its trucks, storing them with their loads in the garage, or in the operation of the garage; in other words, there is no evidence from which the court would have been justified in finding that respondent was negligent in handling or storing appellant's goods in its

garage, or in finding that the fire from which the damage to the goods resulted was caused by or due to respondent's negligence.

For the reasons herein stated, the judgment of the trial court must be and is hereby affirmed.

SIMPSON, C. J., STEINERT, GRADY, and MALLERY, JJ., concur.

*Edward A. Davis*, for respondent.

[1]Reported in 143 P. (2d) 540.