**GENERAL AMERICAN TRANSP. CORP. v. INDIANA HARBOR BELT R. CO.**

No. 10278.

United States Court of Appeals
Seventh Circuit.

Oct. 17, 1951.

Rehearing Denied Nov. 14, 1951.

R. S. Outlaw, Thomas J. Barnett, Chicago, Ill., Preston Shirley, Galveston, Tex., for appellant.

Edward P. Morse, Edwin A. Rothschild, Chicago, Ill., Sonnenschein, Berkson, Lautmann, Levinson & Morse, Chicago, Ill., of counsel, for appellee.

Before KERNER, DUFFY, and SWAIM, Circuit Judges.

SWAIM, Circuit Judge.

This is an appeal from judgments against the two defendants, Indiana Harbor Belt Railroad Company and Baltimore and Ohio Chicago Terminal Railroad Company, as the initial carriers, for damages in the total amount of $126,285.45 to 66 carloads of knocked-down French box cars which defendants and connecting rail carriers carried from East Chicago, Indiana, to Texas City, Texas. The French box cars were manufactured by plaintiff, General American Transportation Corporation, and shipped over defendants' lines to French Supply Council, an agency of the French Government, at Galveston, Texas, for export to France. After the arrival of these shipments at Galveston they were diverted

to Texas City, Texas, on the order of an agent of the consignee.

Galveston Wharves was the terminal land carrier of freight exported through Galveston and owned and operated the Galveston port facilities. At Texas City the Texas City Terminal Railway Company was the terminal land carrier of freight exported through that port. It owned a spur track extending about five miles from the port to its junction with the lines of the line haul carriers and also owned and operated the port facilities at Texas City.

Gulf, Colorado & Santa Fe Railway Company and Burlington-Rock Island Railroad Company were line haul carriers each having lines running to Galveston and Texas City and connecting with the lines of the terminal carriers at those two ports.

On April 16, 1947, at the time of the Texas City disaster, the 66 carloads of freight here in question had arrived and were located on the premises of the Texas City Terminal Railway Company. Sixty-four of the 66 carloads, units numbered 26 to 41, both inclusive, had, on the order of the consignee, been unloaded on the ground for temporary storage to await the arrival of a ship on which they could be loaded for export. The remaining two carloads, IC–94123 and NYC–706855, had not been unloaded, but one of them had been switched alongside the ship for unloading. Of the 64 cars which had been unloaded, 11 carloads had been reloaded on railroad gondola cars on the order of the consignee for the purpose of switching them alongside the ship on which they were to be exported. While in this situation the shipments on the 66 cars were damaged or destroyed by the Texas City explosions and fires on April 16 and 17, 1947.

The plaintiff contends that the defendants, as initial carriers of interstate shipments on a through bill of lading, were liable under the Carmack Amendment to the Interstate Commerce Act, 49 U.S.C.A. § 20(11), for damages as an insurer. On the other hand, the defendants insist that at the time of the explosions and fires their carriage of the goods had terminated and,

since it was stipulated that the damage was not caused by neglect or fault of any of the carriers involved, the defendants could not be held liable as warehousemen. These opposing contentions present the principal question for our decision.

The original contract for the sale of these box cars was between the plaintiff and the French Supply Council. By a subsequent exchange of letters between the French Supply Council and the plaintiff it was agreed that the French Supply Council would act as plaintiff's "agents for the purpose of coordinating and effecting the actual delivery to shipside either direct or through the medium of railroad storage-in-transit." The French Supply Council then appointed J. D. Latta, a freight forwarder, to assist it in supervising, directing and controlling transportation of these shipments from inland United States to France. The parties stipulated that "all of the acts, activities, agreements and directions referred to in" the stipulation as having been done by Latta or by his subordinates, Clark or Major, "were acts performed by them, * * * as representatives of the consignee, French Supply Council-Transit Division, and were duly authorized by said consignee."

Pursuant to these arrangements and understandings between the parties, the plaintiff shipped each carload under a Uniform Domestic Straight Bill of Lading which showed French Supply Council, Galveston, Texas, as the consignee; that J. D. Latta, Galveston, was to be notified and that the shipment was for export and was to be stored at the Galveston Wharves in accordance with arrangements with E. H. Thornton, General Manager of Galveston Wharves.

Among the contract terms and conditions of the transportation, inscribed on the reverse side of each bill of lading, were the following:

"Sec. 1(a) The carrier or party in possession of any of the property herein described shall be liable as at common law for any loss thereof or damage thereto, except as hereinafter provided.

"(b) * * * The carrier's liability shall be that of warehouseman, only, for loss, damage, or delay caused by fire occurring after the expiration of the free time allowed by tariffs lawfully on file (such free time to be computed as therein provided) after notice of the arrival of the property at destination * * * duly sent or given, and after placement of the property for delivery at destination, or tender of delivery of the property to the party entitled to receive it, has been made. Except in case of negligence of the carrier or party in possession * * *, the carrier or party in possession shall not be liable for loss, damage, or delay occurring while the property is stopped and held in transit upon the request of the shipper, owner, or party entitled to make such request, * * *.

* * * * * *

"Sec. 4(a) Property not removed by the party entitled to receive it within the free time allowed by tariffs, * * * after notice of the arrival of the property at destination or at the port of export (if intended for export) has been duly sent or given, and after placement of the property for delivery at destination has been made, may be kept in vessel, car, depot, warehouse or place of delivery of the carrier, subject to the tariff charge for storage and to carrier's responsibility as warehouseman, only, * * *."

Freight on each carload was prepaid by plaintiff at the rate prescribed by Export Freight Tariff 1016-I for transportation from East Chicago, Indiana to Galveston or Texas City, Texas, for export to Europe. Item 1250 of this tariff provided that in the absence of specific provisions therein to the contrary, shipments transported under that tariff would be entitled to such privileges and subject to such charges, rules and regulations as were provided by tariffs lawfully in effect and on file with the Interstate Commerce Commission. Privileges enumerated included, among others, demurrage, diversion, loading, stop-off, storage, switching, unloading, weighing and inspection. Item 60 of Freight Tariff No. 1033-M covering cost of storing, custody and possession provides as follows:

"(a) The cost of warehouse, storage, insurance, cartage or other charges incident to storage of the property at transit station will be at the expense of shipper, consignee or owner; and carriers will not assume any part thereof.

"(b) While shipments are being transited under provisions of this tariff, the custody and possession as between carrier and shipper, consignee or owner shall be that of shipper, consignee or owner."

Item 350-K of Supplement No. 92 to Export Freight Tariff No. 1016-I covers shipside application of export rates and provides as follows:

"Except as otherwise provided in Items 351 thru 359 or in individual rate items, rates in this tariff apply to shipside. Where such rates apply to shipside, rail lines will perform the service or assume the cost of switching, wharfage (tollage) and one handling (unloading) service.

"The term 'shipside' means the place at port of exit at which railroad will place export freight for receipt by ocean ships or vessels.

"Under rates applying to shipside rail lines will place export freight for receipt by ocean ships or vessels only:

"(a) In or on cars placed on tracks or docks, wharves or piers, or

"(b) On the ground floor of docks, wharves or piers directly served by railroad tracks. Second floor docks, wharves or piers directly served by elevated railroad tracks will be treated the same as ground floor docks, wharves or piers."

Supplement No. 94 to Export Freight Tariff No. 1016-I gives the rates on shipments of freight to the Southern ports for export from various inland ports including Indiana. These rates are approximately fifty per cent of the rates for domestic rates between the same points.

Item 360 of Freight Tariff No. 1033-M of Southern Ports Foreign Freight Committee gives the rules and regulations governing transit privileges on export

traffic such as that here involved at Gulf Ports including Texas City, Texas. This Item provides in part as follows:

Such shipments " * * * when handled in line-haul service may be unloaded and stored in or on the premises of wharf companies or terminal operators (not railroad premises) adjacent to water front facilities at Gulf Ports, shown in Item 1, to which shipments are billed for export when such shipments are brought into the point of storage on basis of the all rail rate applicable from point of origin to the place of storage provided the shipper or consignee makes his own arrangements for storage and identical shipments will thereafter be directly placed on board ship at such port for actual exportation within twelve months after arival at the port and further provided the owner or operator on whose premises the shipments are stored gives a good and sufficient bond satisfactory to and approved by the railroad transporting the shipment into the port, guaranteeing to such railroad the payment of the domestic rates in tariffs, lawfully on file with the Interstate Commerce Commission in effect from point of origin at time of shipment therefrom on all shipments not exported under the provisions of these rules.

"When the rates assessed for transportation charges apply to shipside, the rail carrier will assume wharfage (tollage) charges and the unloading charges at point of storage; also the initial cost of switching to the point of unloading to storage, but will not assume any part of the cost of storage, reloading, switching or other expense necessary after the first unloading to place shipment at shipside on docks, wharves or piers."

Supplement No. 45 to Texas Lines' Tariff No. 25–K, prepared by Ira D. Dodge, Agent, showing Demurrage and Storage Rules, provided that on these shipments the free time allowed on cars before demurrage would be charged consisted of four days of 24 hours each, such free time to commence and to "be computed from the second 7:00 A. M. after the day on which written *notice of arrival at destination, port of exit or hold point* is sent by United States Mail or delivered by messenger to the consignee, exporter, steamship line or party entitled to receive same at port of exit." (Our emphasis.)

On April 1, 1947, the cars here involved were being held under demurrage at Galveston, where neither ship space nor storage space was available. Since there would be no ship available at the time these cars reached the Texas City Port the consignee was faced with the choice of either paying demurrage on cars held under load or of paying a lesser amount for storage, reloading and switching to shipside. It chose the latter course, a course which was more expensive for the carriers because loading aboard ship was done by stevedores for the steamship company, while unloading to storage was done by the terminal company. J. D. Latta, acting on behalf of the consignee, delivered to the Santa Fe Railway Company a diversion order asking the Santa Fe to immediately divert said cars to Texas City "for unloading." This order was promptly complied with. All of the cars arrived on the premises of the Texas City Terminal Railway Company on April 2, 1947, where they were first placed in the classification yards which were located about one-quarter of a mile from the docks.

Prior to the arrival of these shipments at Texas City arrangements had been made by a representative of the consignee with the Texas City Terminal Railway that when the cars arrived in Texas City they would be unloaded for storage on the premises of the Texas City Terminal and held until shipping space was available. The particular place for storage, about 1,100 feet from Pier A, was agreed to by a representative of the Texas City Terminal Railway and a representative of the consignee. The charge for storage to be paid to the Terminal Company by the consignee was also agreed to by the consignee and the Terminal Company.

On or before April 4, 1947, the agent of the consignee was notified of the arrival of all of these shipments on the premises of the Texas City Terminal. At the time the notices were given all of the cars were either on Track 16 or in the classification yards of the Terminal. Those in the classi-

fication yards had been tagged for switching to Track 16. The undisputed evidence was that "notices of arrival" given when the cars were on the Terminal premises, either on Track 16 or in the classification yards, had always been considered sufficient notices of arrival at destination to start the "free time" running for the purpose of computing demurrage. The applicable tariff, No. 25-K, expressly provided that such notices might be sent on arrival "at destination, port of exit, or hold point."

By April 10th, 64 of these carloads had been unloaded to the storage pile, pursuant to the directions of the consignee. Two of the 66 carloads at the time of the explosion were not unloaded to storage. One of these two was still standing on Track 16 and the other, still unloaded, had been switched alongside the ship for unloading.

On April 11, 1947, the S. S. High Flyer, on which consignee had arranged for space for part of these shipments, docked at Pier A in the Texas City Port. After the arrival of the ship no more carloads were unloaded for storage.

In the afternoon of April 14, 1947, Mr. Latta, acting through Mr. Clark, his agent, issued a telephone order, later confirmed in writing, to the Terminal Railway Company directing that 44 of the Santa Fe carloads here in question, then in storage on the Terminal property, be reloaded on gondola cars and then, together with the two cars still under load, switched to Pier A for unloading to the High Flyer. The written order was received by the Texas City Terminal Railway Company on the morning of April 15, 1947. The same morning the Terminal Railway Company commenced compliance therewith. Between the receipt of the said order and the time of the first explosion on the morning of April 16, 1947, the Terminal Railway Company reloaded 11 of the carloads from the storage pile into new gondola cars for delivery to shipside and switched one of the two cars which had not been unloaded to shipside.

If the High Flyer had been docked at Texas City when the 66 Santa Fe cars had arrived at Texas City they would have been at once switched to shipside and unloaded

aboard ship without any necessity of unloading to storage. The failure of the High Flyer to be then available was admittedly not due to any fault on the part of any of the rail carriers.

The plaintiff insists that under the facts of this case the defendant railway carriers could only escape the common law liability of carriers by delivering the shipments here in question to an ocean vessel at the Texas City dock. The plaintiff supports this contention by relying chiefly on Galveston Wharf Co. v. Galveston H. & S. A. R. Co., 285 U.S. 127, 134, 52 S.Ct. 342, 76 L.Ed. 659; Southern Railway Co. v. Prescott, 240 U.S. 632, 637-8, 36 S.Ct. 469, 60 L.Ed. 836; North Penn. Railway Co. v. Commercial Bank, 123 U.S. 727, 735, 8 S.Ct. 266, 31 L. Ed. 287, and Lehigh Valley Railway Co. v. John Lysaght, Ltd., 2 Cir., 271 F. 906, certiorari denied 256 U.S. 704, 41 S.Ct. 625, 65 L.Ed. 1180. In our opinion none of these cases supports this contention of the plaintiff.

In the Galveston Wharf Co. case there was no question of storage in transit or as to the type of liability but only a disagreement as to which carrier should be liable. The court there merely held that where a shipment from Maine to El Paso, Texas, was carried by ship from Maine to Galveston and there unloaded on a pier belonging to the Wharf Company for the Wharf Company to transfer the shipments from the wharf to the cars of the railway company for completion of the interstate shipment by rail, the Wharf Company was a common carrier furnishing a necessary link in that interstate transportation and was, therefore, liable as between it and the other two carriers for the shipment which burned on its pier before it could be reloaded onto the rail carrier.

In Southern Railway Co. v. Prescott, supra [240 U.S. 632, 36 S.Ct. 470], an interstate shipment arriving at its destination was partially unloaded by the consignee and the remainder of the shipment was left by the consignee in charge of the carrier for the convenience of the consignee. In that case the bill of lading provided that " 'property not removed by the party entitled to receive it within forty-eight hours

\* \* \* after notice of its arrival, might be kept in car, depot, or warehouse 'subject to reasonable charge for storage and to carrier's responsibility as warehouseman only.'" Under the facts of that case, it was conceded that the contract of carriage was ended and the question of the appellant's liability as a common carrier and the Federal statute under which it might have arisen were not before the court. The only question argued and considered by the court was whether the Federal or state law governed on the question of the liability of the carrier for negligence as a warehouseman. The Supreme Court held there that the Federal statute governed since it was an interstate shipment. This case is only authority for the proposition that the provisions of the bill of lading and the Federal law governed even though the actual movement of the shipment had ceased and the liability of the carrier had changed to that of warehouseman.

The plaintiff here also relies on Cleveland, C., C. & St. L. Railroad Co. v. Dettlebach, 239 U.S. 588, 36 S.Ct. 177, 179, 60 L.Ed. 453, which was similar to Southern Railway v. Prescott in that there also the interstate shipment had stopped and only the liability of the carrier as a warehouseman was involved. The transportation there had been purchased by the shipper at a low rate upon a stated valuation and the Court was faced with the question of whether the limitation of liability on stated valuation had "spent its force upon the completion of the carrier's service as such, or must be held to control, also, during the ensuing relation of warehouseman." The court held that the limited liability, on account of the stated valuation and the lower rate, was extended and covered the time after the actual movement had ceased, when the carrier was only acting as warehouseman. There again the court recognized that the relation of the carrier as warehouseman could arise before an actual delivery of the shipment. Another case cited by plaintiff to the same effect is Western Transit Co. v. A, C. Leslie & Co., 242 U.S. 448, 37 S.Ct. 133, 134, 61 L.Ed. 423, where the court stated that the "question before this court relates solely to the measure of damages."

The plaintiff also cited and relied on Michigan Central Railroad Co. v. Mark Owen & Co., 256 U.S. 427, 41 S.Ct. 554, 65 L.Ed. 1032, where goods were shipped on a bill of lading providing that 48 hours after notice of arrival the carrier's liability became that of a warehouseman. When the goods arrived at their destination they were placed on a public delivery track of the railroad company and notice thereof given. The consignee accepted each car, broke the seals thereof and started to unload the contents. The loss occurred after the happening of these events but before the expiration of the 48 hours after arrival. The question before the court was as to whether the railroad company was liable therefor and, if so, whether as a carrier or as a warehouseman. The court construed the 48-hour provision of the bill of lading as fixing the reasonable time for consignee to accept the goods, after which period its responsibility would be that of warehouseman only. The court said, 256 U.S. at page 432, 41 S.Ct. at page 556, "The bill of lading is definite, as we have pointed out, in its provisions and of the time at which responsibility of the company shall be that of warehouseman, and by necessary implication, therefore, until that responsibility attaches, that of carrier exists."

In the North Penn. Railway case delivery to a person other than the consignee was involved and the court held that delivery must be to the consignee or to the order of the consignee. Of course, the carrier would be liable for loss caused by misdelivery.

This argument of the plaintiff that there must be actual delivery to an ocean vessel, carried to its logical conclusion would mean that the carrier's liability could be kept in force indefinitely by the consignee by its simply failing to provide space on a ship onto which the shipment could be unloaded. This is not the law. There is considerable confusion in the language of the decisions as to just when the insurer liability of the carrier terminates but it does not endure indefinitely. It seems clear that a tender of delivery, if refused by the consignee, would also terminate the carrier's responsibility as an insurer.

In Dohrman Hotel Supply Co. v. Owl Transfer, 1943, 19 Wash.2d 522, 143 P.2d 441, 149 A.L.R. 1108, the Transfer Company's truck was engaged to haul a shipment of goods from a point in the City of Seattle, Washington, to Pier A in that city, for delivery to the United States Army. At the designated pier the truck was refused permission to unload and was directed by the Army to take the shipment to another dock. The driver proceeded immediately with the shipment to the second dock but arrived too late for unloading there. The shipment was then returned to the Transfer Company's garage where a short time later it was destroyed by fire. The court there held that the Transfer Company had made a tender of delivery at Pier A and, since delivery was refused there by the consignee, the Transfer Company's liability had changed to that of a warehouseman only and that, since plaintiff failed to show negligence on the part of the Transfer Company, it could not be held liable. In that case it was pointed out that in Keystone Motor Freight Lines v. Brannon-Signaigo Cigar Co., 5 Cir., 115 F.2d 736, 738, while the court decided the case upon the theory that there had not been a proper tender, the court recognized that a proper tender would have reduced the carrier's liability to that of a warehouseman but that "since a proper tender of delivery would have reduced the liability of the carrier to that of a warehouseman, the solution of the question of its status became necessary to a decision of the case, and depended wholly upon the circumstances surrounding the alleged tender." See also Southwest National Bank of Dallas v. M-K-T Railroad Co. of Texas, Tex.Civ.App. 1929, 18 S.W.2d 807.

In the instant case there was a tender of delivery when the cars arrived on the Terminal property and notices of arrival were properly given. The plaintiff insists that these notices were not properly given; that at the time they were given the shipments had not arrived at their destination. The applicable tariff, Supplement No. 45—Tariff No. 25–K, expressly provided for notice of arrival " * * * at destination, port of exit, or hold point * * *." The notices were delivered when the shipments were in the classification yards of the Terminal Company. Arrival at either of the three named locations was sufficient. It cannot seriously be contended under the evidence here that the classification yards of the Terminal Company did not constitute a part of the "port of exit," or that notice of arrival sent when the cars were so located would not in effect say to the consignee, "We have your cars here ready for delivery." In the instant case the bill of lading under which these shipments were made expressly provided that the carrier's liability should be that of a warehouseman only "after *tender* of delivery of the property to the party entitled to receive it, had been made." (Our emphasis.) This provision is limited only by Supplement No. 45—Tariff No. 25–K giving free time from date of arrival through the fourth day after the second 7:00 A. M. and by Section 4(a) of the bill of lading which indicates that carrier will continue under its insurer liability until the free time had expired. Here the consignee was notified of the arrival of each of these cars on or before April 4th, more than ten days before the first explosion.

In Berwind-White Coal Mining Co. v. Chicago & Erie Railroad Co., 235 U.S. 371, 35 S.Ct. 131, 59 L.Ed. 275, it was held that cars billed to Chicago for reconsignment had reached their destination for the purpose of a demurrage charge where, in accordance with the practice which had existed for many years, they were held on storage tracks at Hammond, Indiana, a point which was convenient to the Belt Line by which cars could be transferred to any desired new destination. In Raleigh Smokeless Fuel Co. v. Virginia Railway Co., 4 Cir., 43 F.2d 555, cars of coal were shipped from a point in West Virginia to Sewalls Point, Virginia. Upon the arrival of the cars at South Branch yard near Norfolk, Virginia, notice of arrival was given and a delay in accepting delivery ensued. South Branch yard is a holding yard situated on a line of the Railway Company within 12 miles of Sewalls Point. It is used for holding cars until they can be unloaded at Sewalls Point and has been so used for many years to prevent congestion. Cars of coal destined for Sewalls Point are held in stor-

age by the plaintiff in this yard until they can be dumped in vessels at the Sewalls Point piers. The court there said: "We think that under any fair interpretation of the tariffs of plaintiff, 'arrival at Sewalls Point' must be construed to include arrival at the yards within which it is customary to hold cars while same are waiting to be unloaded at Sewalls Point." The court there cited the Berwind-White case and considered it determinative.

If there had been no unloading to storage nor any order for reloading for switching to shipside the liability of the defendants would clearly have been only as warehousemen for all 66 of the cars at the time the property was damaged on April 16th and 17th. The situation would have come under the general rule as stated in 9 Am.Jur., Sec. 677, page 829, as follows: "The mere arrival of the goods at their destination does not reduce the liability of the carrier to that of a warehouseman where anything remains to be done by the carrier in order to effectuate a delivery. It is, however, the duty of the owner, the consignee, or the person authorized to receive the goods to act promptly in receiving and taking the goods upon their arrival, and if he fails to do so, the liability of the carrier as an insurer is terminated. The general rule, in the absence of any statutory or contractual provision to the contrary, is that where the property remains in the carrier's possession after a constructive delivery, the carrier holds it in the character or capacity of an ordinary bailee or warehouseman, with the liability incident to such relation. * *"

Here, however, 64 of the 66 cars were unloaded into storage by the Terminal Railway Company at the request and for the convenience of the consignee. Switching to the storage place and unloading there used up all of the transportation charges which had been prepaid to the defendants as the initial carriers. Sec. 360 of Freight Tariff No. 1033-M provides that on such shipments as those here involved: "When the rates assessed for transportation charges apply to shipside, the rail carrier will assume wharfage (tollage) charges and the unloading charges at point of storage; also the initial cost of switching to the point of unloading to storage, but will not assume any part of the cost of storage, reloading, switching or other expense necessary after the first unloading to place shipments at shipside on docks, wharves or piers."

By the provision of this tariff the consignee and carriers by rail agree that the consignee may arrange for storage at the point of exit for not more than 12 months provided that the consignee makes all arrangements with the Terminal Company for storage, for reloading from storage and for switching to shipside. In other words, if the consignee decides to store the shipment at the port of exit because no ship is available, or for any other reason, the parties agree that after the terminal carrier has unloaded the shipment to storage, the responsibility for further movement is on the consignee. The responsibility of the carriers for further movement under the original contract for transportation has ceased. It naturally follows that the insurer liability of the carriers under the original contract for interstate transportation ceased when the goods were so unloaded to storage.

Such an agreement for the limitation of the responsibility of the carriers is reasonable and is neither against public policy nor the provisions of the Carmack Amendment to the Interstate Commerce Act, 49 U.S.C.A. § 20(11). On such an agreement the shipper secured the benefit of a freight rate of about 50 per cent of the authorized rate between East Chicago and Texas City on goods which were not for export. The shipper also secured the benefit of being able to store the goods for 12 months at a cheap rate rather than to hold the cars under load and pay demurrage while awaiting the arrival of a ship. These advantages to the shipper furnished a valid consideration to the shipper for agreeing that while the goods were in storage the liability of the rail carrier should be reduced to that of warehouseman. After the shipper has accepted and taken advantage of these considerations it should not then be permitted to say that the agreement with the carrier was against public policy and invalid. It should be compelled to accept the disadvantages as well as the advantages of the contract it has made.

The general rule as to the liability of the carrier when goods have arrived at their destination and at the request and for the convenience of the consignee remain in the custody of the carrier is stated in 9 Am. Jur. 839, Sec. 687, as follows: "The authorities are in harmony in holding that when goods have arrived at their destination, and at the request and for the convenience of the consignee are allowed to remain in the custody of the carrier, its liability as an insurer of the goods thereupon ceases and becomes thereafter ordinarily that of a warehouseman or a depositary. * * *"

Finally, plaintiff contends that even if the only liability during the storage period was that of a warehouseman, upon the issuance of the order to reload 44 of the carloads in storage and to switch them and the two cars still under load down to Pier A for loading aboard the High Flyer, the Terminal Railway then again became a carrier engaged in completing the performance of the original contract for interstate transportation and thereby the insurer liability of the defendants was reinstated, at least as to these 46 cars. To support this contention the plaintiff relies principally upon Lehigh Valley Railroad Co. v. John Lysaght, Ltd., 2 Cir., 271 F. 906. That case involved damage to goods shipped from Kansas to New York City for export. The shipments arrived in the yards of the defendant rail carrier in Jersey City, New Jersey, on July 17 and 18, 1916, and were held there, awaiting delivery orders until the night of July 29th, when they were destroyed by the explosion at the Black Tom Terminal. On the afternoon of July 29th the owner of the shipments gave orders to deliver them on August 2, 1916, to Pier 69 North River, New York, for loading aboard a ship for export. The defendant contended that at the time of the explosion it was holding the shipments as warehouseman and was, therefore, not liable for damage caused by the explosion for which it was in no wise responsible. The owner of the goods, on the other hand, contended that by its order to take the goods to the pier in New York Harbor, the carrier liability of the defendant railroad company was reinstated. In the trial court the plaintiff demurred to the defendant's answer. In overruling the demurrer Judge Learned Hand said, 271 F. at page 909: "It does not, of course follow that the defendant became a carrier at the moment of receiving the order at 1:42 p. m. For example, it might be that that was too late for delivery that evening. If so, the defendant's liability would not attach until such time as it could have commenced delivery under the conditions of the harbor. All such considerations cannot be decided upon the pleadings; they must wait for the evidence developed at the trial. It does not follow, therefore, that on Sunday, July 30th, the defendant was not still holding as a warehouseman, but it equally does not follow that it was."

The Court of Appeals sustained the judgment of the trial court on a directed verdict for the plaintiff. There, however, the Court of Appeals based its decision that the carrier liability had been reinstated at the time the further shipping instructions were given upon the defendant carrier's tariff, Sec. A–1 of which expressly provided that: "* * * shipments for delivery * * * to vessels in New York Harbor, * * * will be held in or on cars * * * at Jersey City, N. J. * * * *until receipt of written order for disposition from consignee* or party notified of arrival under the terms of the bill of lading, and while so held at Jersey City, N. J. * * * awaiting such orders for disposition, the freight will be subject to car demurrage * * * and *the carrier shall not be liable for loss, damage or delay, except in case of negligence of the carrier.*" (Our emphasis.) The tariff thus fixed the exact time for carrier liability to be reinstated.

Since the decision in that case is based on the court's interpretation of the defendant railway company's particular tariff, it would seem that the decision should not be considered as holding that, in the absence of such a tariff provision, the carrier would not have a reasonable time within which to commence its carriage again and for the reinstatement of carrier liability. Another important distinction is that there, clearly, the shipment could not be said to have reached its destination. The original contract of carriage called for delivery at an

undesignated pier in New York Harbor. Stopping the shipment in the terminal of the railroad company in Jersey City, New Jersey, was a stoppage and holding in transit for orders giving the date for the completion of the transportation and the definite destination. We do not consider that case decisive of the question with which we are confronted in the instant case.

Here the interstate transportation had come to an end. Sixty-four carloads were in storage pursuant to the arrangement between the consignee and the Terminal Railway Company. The other two cars were being held under load subject to demurrage. The order of the Terminal Railway Company to reload and switch to shipside was only a local arrangement between the consignee and the Terminal Railway Company, an order which called for reloading part of the cars and switching them to shipside, for which service the consignee would pay the Terminal Company. The switching to shipside, a movement of not more than one-fourth to one-half mile within the confines of the Terminal Company's premises, could not be considered anything more than a terminal switching operation.

For the reasons assigned above we are of the opinion that the judgments against the defendants should be reversed and that the District Court should be directed to enter judgment in each of the cases for the defendant.

It is so ordered.